MERANZE AND KATZ, P.C.
BY:   Bernard N. Katz, Esquire (Id. # 09723)
      Claiborne S. Newlin, Esquire (Id. # 84371)
225 S. 15th Street, 12th Floor
Philadelphia, PA 19102
Tel.: (215) 546-4183
Fax: (215) 790-1382

FILED
WILLIAMSPORT, PA

DEC 0 5 2002

MARY E. D'AND___ ___LERK
PE___ _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IUE-CWA, LOCAL 628<br>429 West Third Street<br>Williamsport, PA 17701<br><br>              Plaintiff,<br>    v.<br>FLOWSERVE CORPORATION OF PENNSYLVANIA<br>701 First Street<br>Williamsport, PA 17701<br>              Defendant | CIVIL ACTION<br><br>NO. 4:CV 02 2225 |

## COMPLAINT

**Parties:**

1.   Plaintiff, IUE-CWA, Local 628, (Local 628), is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. §152(5), and Section 301(a) of the Labor-Management Relations Act (LMRA), 29 U.S.C. §185(a), with its offices at 429 West Third Street, Williamsport, PA 17701.

2.   Defendant Flowserve Corporation (Flowserve) is branch of Flowserve Corporation of Irving Texas and is registered to do business or otherwise performs substantial

1

business in the Commonwealth of Pennsylvania. Defendant Flowserve is an employer within

with the meaning of Section 2(2) of the National Labor Relations Act, 29 U.S.C. §152(2) and

Section 301(a) of the Labor-Management Relations Act. 29 U.S.C. §185(a) and maintains a

principal place of business located at 701 First Street, Williamsport, PA 17701.

**Jurisdiction and Venue:**

3.     Plaintiff and defendant are parties to a Collective Bargaining Agreement (CBA)

effective from June 3, 2000 through May 31, 2003. A copy of this Agreement is attached as

Exhibit "A."

4.     This Court has jurisdiction under § 301(a) of the Labor Management Relations

Act, 29 U.S.C. § 185(a), which provides that United States District Courts have jurisdiction over

suits for a violation of a contract between an employer and a labor organization.

5.     Under § 301(c) of the Labor Management Relations Act, 29 U.S.C. § 185(c),

venue is appropriate in the Middle District of Pennsylvania where Flowserve has a principal

place of business.

**Facts:**

6.     As stated in ARTICLE I of the agreement, the CBA covers a bargaining unit

made up of all production and maintenance employees employed by Flowserve at its

Williamsport facility.

7.     In ARTICLE II, Section 1 of the CBA, Flowserve recognizes Local 628 as the

sole collective bargaining agency for its unit employees.

8.     ARTICLE XVI, Section 1 of the Agreement sets out a procedure to be followed

for any difference arising between Flowserve and Local 628 "concerning the effect, meaning,

application, compliance, claim of breach or violation of the Agreement ...."

9.     Under the procedure, in the event that the parties fail to settle a dispute

concerning the interpretation or application of the express provisions of the Agreement,

Flowserve and Local 628 agree to arbitrate their dispute before an arbitrator selected in accordance with the rules and procedures of the American Arbitration Association.

10.     On July 9, 2002, Flowserve notified its employees that it would close its Williamsport operation and transfer all manufacturing to a non-union facility in Raleigh North Carolina by mid 2003. This transfer would result in the total destruction of the Local 628 bargaining unit and the termination of all Local 628 members. (*See*, Exhibit "B," Laielli, Aff. at ¶¶6-8.) A copy of the notice is attached as Exhibit "C."

11.     Upon receipt of the notice, Local 628 undertook negotiations seeking to determine the reasons for Flowserve's decision and with the object of persuading Flowserve to reverse its determination to close the Williamsport facility. These efforts proved fruitless. (*See*, Exhibit "B," Laielli, Aff. at ¶¶9-14.)

12.     On September 24, 2002, Local 628, by and through its attorneys, filed a grievance with John J. Chappell, the general manager of Flowserve in Williamsport, protesting Flowserve's transfer of all bargaining unit work out of the Williamsport facility. (*See*, Exhibit "B," Laielli, Aff. at ¶15.)

13.     In its grievance, Local 628 contends that Flowserve's relocation decision is a violation of the express provisions of the CBA. (*See*, Exhibit "B," Laielli, Aff. at ¶¶16-17.)

14.     On October 10, 2002, after initially denying that the grievance was arbitrable under the CBA, Flowserve relented and indicated that it would agree to participate in the American Arbitration Association procedure for naming an arbitrator to consider the grievance.

15.     On November 15, 2002, Flowserve notified Local 628 that, as part of its work relocation, it would commence laying off bargaining unit members in December 2002. (*See*, Exhibit "B," Laielli, Aff. at ¶26.)

16.     According to the schedule provided, Flowserve will terminate all bargaining unit members prior to May 31, 2003, the expiration date of the CBA. (*See*, Exhibit "B," Laielli, Aff. at ¶27".)

17.     While it has refused to provide specific information, Flowserve has also indicated that it has begun, and will continue, to move raw materials, work, equipment and machinery out of Williamsport to Raleigh, North Carolina. (*See*, Exhibit "B," Laielli, Aff. at ¶28.)

18.     On November 22, 2002, the American Arbitration Association notified the parties that Arbitrator Jeffrey Tener would hear Local 628's work relocation grievance on January 15, 2003. (*See*, Exhibit "B," Laielli, Aff. at ¶29.)

19.     By and through its attorneys, Local 628 has repeatedly requested that Flowserve maintain the status quo until the arbitrator renders his award. Flowserve has refused all such requests. (*See*, Exhibit "B," Laielli, Aff. at ¶¶30-31.)

20.     In all likelihood, Flowserve will have accomplished a complete shutdown of its facility, including terminating all employees and removing all equipment and machinery, prior to Arbitrator Tener having an opportunity to issue an award. (*See*, Exhibit "B," Laielli, Aff. at ¶32.)

21.     Plaintiff's request for arbitration is not a futile endeavor and plaintiff has a colorable claim that the CBA has been violated.

22.     Unless the Court enjoins defendant's conduct, defendant will continue its violations of the CBA, causing substantial and irreparable harm to the employees represented by Local 628 in that:

    a.     Flowserve will unilaterally terminate Local 628's representation rights prior to the expiration of the CBA.

    b.     Flowserve will fire all Local 628 represented employees before the end of the CBA.

    c.     Flowserve will liquidate all work that is the subject of the CBA;

    d.      Flowserve will have removed all raw materials, work, equipment and machinery from its Williamsport facility.

23.     The grievance and arbitration procedure in the parties' agreement cannot provide an adequate remedy for the injuries Flowserve is inflicting upon its employees. Under that procedure Flowserve could end Local 628's representation rights, terminate all employees, remove all raw materials and machinery and permanently close its facility prior to Arbitrator Tener having an opportunity to render an award. As a result the arbitrator would be left with no adequate remedy for Flowserve's violation of the parties' agreement.

24.     As to each item of relief requested, greater injury will be inflicted upon Local 628 and its members by the absence of relief that will be imposed upon the Defendant by the granting of relief.

25.     The grant of an injunction will further the public interest in the peaceful resolution of labor disputes.

WHEREFORE, Local 628 requests that this Honorable Court enter judgment on behalf of Local 628 and against Flowserve and order relief as follows:

    a.      Enter a preliminary and thereafter permanent injunction requiring Flowserve to:

        1.     Immediately cease removing raw materials, work, equipment and machinery from its Williamsport facility;

        2.     Restore all raw materials, work, equipment and machinery that were removed from its Williamsport facility after July 9, 2002;

        3.     Cease all plans to layoff employees and/or transfer work, equipment and machinery in connection with closure of the Williamsport facility;

        4.     Announce publicly to its employees and the Williamsport community that Flowserve will take no steps to liquidate the Williamsport facility until the Arbitrator renders his award; and

5.    Agree that Flowserve take no further actions to undermine or subvert the
arbitration process.

b.    Award Local 628 the reasonable attorney's fees and costs incurred in bringing this
action; and

c.    Such other relief as the Court deems proper and just.

Respectfully submitted,

MERANZE AND KATZ, P.C.

BY:    BERNARD N. KATZ
CLAIBORNE S. NEWLIN

December 5, 2002

6

**AGREEMENT**

**Between**

**<u>FLOWSERVE CORPORATION</u> OF PENNSYLVANIA, INC.**

**and**

**INTERNATIONAL UNION OF
ELECTRONIC, ELECTRICAL,
SALARIED, MACHINE &
FURNITURE WORKERS,
AFL-CIO**

**AND**

**LOCAL UNION NO. 628**

**<u>June 3, 2000 through May 31, 2003</u>**



# AGREEMENT

## Between
## <u>FLOWSERVE CORPORATION</u> OF PENNSYLVANIA, INC.

## and

## INTERNATIONAL UNION OF
## ELECTRONIC, ELECTRICAL,
## SALARIED, MACHINE &
## FURNITURE WORKERS,
## AFL-CIO

## and

## Local Union No. 628

AGREEMENT made and entered into on the date set forth below by and between <u>Flowserve Corporation</u>., a Pennsylvania corporation doing business in the City of Williamsport, Pennsylvania, hereinafter called Company, and the International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL-CIO, and its Local Union No. 628, having its local office in Williamsport, Pennsylvania, hereinafter collectively called Union.

WITNESSETH:

That in order to provide a continued working arrangement between the Company and Union, and promote an improved industrial and economic relationship between them, to the end that the Company's business may be efficiently, expeditiously and satisfactorily conducted, said parties hereto agree as follows:

# ARTICLE I
## UNIT
### Employees Covered

This Agreement shall cover all of the Company's Production And Maintenance employees employed by the Company at its facility located at 701 First St., Williamsport, Pennsylvania; excluding Clerical Employees, Truck Drivers, Guards, Foremen, and Supervisors.

# ARTICLE II

## RECOGNITION OF UNION

1. The Company recognizes the Union as the sole collective bargaining agency for all the employees of the foregoing unit and will make no separate agreements with any members of the unit.

### Union Shop

(a) As a condition of employment, all employees of the unit shall, within forty-five (45) working days after date of their employment, become and thereafter remain, members of the Union in good standing with reference to the payment of dues and assessments.

(b) The Company shall not be required to discharge any employee for failure to attain or maintain membership in good standing in the Union unless it shall have received ten (10) days written notice from the Union prior to the date such discharge is demanded by the Union. If the Company discharges any employee upon written demand by the Union, the Company shall not be required, except at its own election, to re-employ such employee; and if re-employed, such employee shall in all respects become a new employee. However, no employee discharged under this section shall be rehired by the Company unless he first places himself in good standing with the Union.

( c ) The Company shall deduct Union dues and initiation fees upon receipt of the proper written authorization. Such deductions shall be made from the first pay of each month and promptly remitted to the Financial Secretary of the Union.

(d) The Union will indemnify and hold the Company harmless against all claims, demands or other form of liability which may arise out of, or by reason of, any action taken or not taken by the Company at the request of the Union in accordance with the provisions of this Article.

Interference Proviso

2.   There shall be no discrimination, interference, restraint or coercion by the Company, or any of its agents, against any employee because of the employee's membership in, or activities on behalf of, the Union. On the other hand, the Union shall not carry on any Union activities on the company's property during working hours except for the handling of grievances. If a dispute arises as to whether there has been a violation of this paragraph, the same shall be taken up under Step III of the Grievance Procedure.

3. It is the Company policy that all employees should conduct themselves in a proper manner at all times and be as understanding as possible with their fellow workers. At no time should he use abusive language or strike a fellow employee. If found guilty of striking another employee, he shall be subject to immediate discharge.

Non-Discrimination

4. It is the continuing policy of the Company and Union that the provision of this Agreement shall be applied to all employees without regard to age, race, color, religious creed, national origin, sex, or disability.

## ARTICLE III
## MANAGEMENT

1. Except as expressly stated by the specific provisions of this Agreement, the Company is vested exclusively with the management of its business, including, but not limited to, the direction of the working force, the right to plan, direct, and control all plant operations; the right to establish, change, or introduce new or improved production methods, standards, or facilities, and the right to hire, promote, transfer, discipline, discharge for just cause, or relieve employees from duty because of lack of work or for other legitimate reasons.

## ARTICLE IV
## SUPERVISORS WORKING

1.   Supervisory employees shall not perform bargaining unit work except in the instruction and training of employees.

## ARTICLE V
## WAGES

1. The Wage and Classification Schedules of employees covered by this Agreement are set forth in Appendix A.

### Report Pay

2. Any employee regularly scheduled to work who reports for work shall be guaranteed four (4) hours work or four (4) hours pay at his regular hourly rate. This provision shall not apply, however, in case of a general breakdown, power failure, acts of God, or other conditions beyond the control of the Company, or where the employee has been notified not to report in accordance with the following paragraph:

3. Each employee shall furnish the Company with his correct address and correct telephone number, or a telephone number at which a message for him can be left. An employee shall have received sufficient notice not to report to work if notified personally by his supervisor prior to the end of the last shift on which he worked, or by telephone message left at the telephone number supplied by the employee, at least eight (8) hours prior to the time the employee would ordinarily report for work; or by registered letter mailed to the address supplied by the employee, and received by him, at least twenty-four (24) hours prior to the time the employee is to report to work.

### Call-In Pay

4. Where an employee is called in to work after he has worked a full shift and has left the Company property, or is called in to work at times other than his regular work period, he shall be guaranteed four (4) hours pay at his regular hourly rate.

### Industrial Injury Compensation

5. In all compensable accidents where Pennsylvania Workman's Compensation does not pay for the first week off, the Company will pay the sum of $250.00 a week or $50.00 a day should the employee be off work less than a full week as industrial injury compensation for the first week lost.

### Temporary Assignment

6. If, at the Company's request, an employee is temporarily transferred to a lower rated job, he will continue to receive the regular hourly rate for his regular job. If the temporary transfer is to a higher rated job, he will receive the regular hourly rate for the new job.

### Jury Duty

7. Any regular employee whose service is required for jury duty and it is impossible for him to work the hours necessary to earn the equivalent of his regular weekly straight time pay, shall be paid the difference between the jury pay received and his regular straight time earnings for a maximum period of thirty (30) calendar days, provided the employee notifies his supervisor and the Human Resources Department upon receipt of notification that he has been placed on jury duty. To be eligible for payment, the employee must furnish the Human Resources Department with a written

statement from the proper court official showing the date, the time served and the amount of pay received.

## New Classifications

8. If the Company establishes a new or changed classification not listed in Appendix A, the Company shall determine the appropriate rate of pay for the new or changed classification and shall notify the Union. If the Union is not satisfied with the Company's determination of the rate of pay for the new or changed classification, a grievance may be filed at Step III of the grievance procedure provided it is filed not less than sixty (60) calendar days nor more than seventy (70) calendar days after the notification to the Union.   The only question subject to the grievance procedure is whether or not the new rate of pay is in proper relation to all other wage rates in the plant.

## ARTICLE VI
## HOURS AND OVERTIME

### Normal and Regular Work Week

1. The normal work week shall be forty (40) hours per week, eight (8) continuous hours per day, commencing with the employee's starting time on his regular shift, except as the same may be interrupted for lunch period, five (5) days per week from Monday to Friday inclusive.

### Overtime

2. All work performed in excess of eight (8) hours in any one day or in excess of forty (40) hours in any regular work week and all work performed on Saturday shall be paid for at the rate of time and one-half the employee's regular hourly rate. All work performed on Sunday shall be paid for at the rate of two times the employee's regular hourly rate. There shall be no pyramiding of overtime.

### NORMAL WORK WEEK
### Extra Shifts

3. The Company may, at its discretion, operate any machine, job, department, as may be required by the volume of work on hand, on the basis of one or more shifts. Regular day shifts will be those which begin and end between five (5:00) A.M. and five thirty (5:30) P.M.. The Company agrees, however, that as far as practicable, employees on the day shift shall start work at seven (7:00) A.M.  For any hours worked outside these regular times, the night shift bonus of forty (40) cents per hour shall be paid. If a third shift is established on any machine or in any job or department, the hours for that machine, job, or department will be from seven (7:00) A.M. to three (3:00) P.M., three (3:00) P.M. to eleven (11:00) P.M. and eleven (11:00) P.M. to seven (7:00) A.M. with the work weeks starting on Sunday at eleven (11:00) P.M. There will be no consideration for the Sunday double time requirement.The third shift bonus of forty (40) cents will be paid for those individuals on that shift.

### Distribution

4. All overtime hours worked shall be distributed by the Company as <u>equally</u> as possible among the employees in their job classifications, in their department, fully qualified to perform the work required. <u>If overtime is limited to a few employees, overtime will be distributed to those employees in the classification/department, fully qualified with the least amount of overtime first. Employees from other classifications that are temporarily assigned or temporarily transferred will be eligible for overtime in that department. Hours, being equal, (defined as within eight (8) hours), overtime will be offered to the senior employee.</u> If an employee is bypassed, he will be given the opportunity to make up for lost time.

<u>5. Overtime for Valve Technician will be distributed equally among employees in their job, in their department, fully qualified to perform the work required. When overtime is needed in the valve tech classification in a department (Stores, Shipping, Grinding 16/17) it will be offered to the Valve Technicians in the department where the work is required first. Should additional help be needed valve technicians from other departments will then be asked based on their overtime hours. Those with the least hours will be asked first. If all others refused, employees from other classifications that are temporarily assigned or temporary transferred to the valve technician classification will be asked.</u>

<u>6. Overtime records will be posted weekly.</u>

For the taking of inventory, the Company shall have the exclusive right to select employees for this purpose and without regard to seniority.

## ARTICLE VII
## HOLIDAYS

<u>Flowserve will provide employees with a total of eleven (11) paid holidays per year. Seven (7) of these are fixed holidays and four (4) are set by each division.</u>

| **Fixed** | **Set by This Division** |
|---|---|
| New Year's Day | First day of buck season |
| Memorial Day | Good Friday |
| Independence Day | Two Floaters  To be determined |
| Labor Day | |
| Thanksgiving Day | |
| Day after Thanksgiving | |
| Christmas Day | |

All holidays which fall on Saturday shall be celebrated on Friday and all holidays which fall on Sunday shall be celebrated on Monday, except as designated above.

Employees shall be paid their straight time hourly rate for eight (8) hours, provided they perform their regular work on their regular scheduled working day immediately before and their regular scheduled working day immediately following the holiday. This limitation on the payment of holiday pay shall not apply if the employee is absent with prior permission.

Any employee entitled to Night Shift Premium at the time of the holiday will receive this payment for all holiday hours paid while on that shift.

Employees who do work on the day the holiday is celebrated shall, in addition to their holiday pay, be paid double time.

Probationary employees shall not be paid for holidays.

Employees who are off on sick leave shall not receive holiday pay for holidays falling in that period.

## ARTICLE VIII
## VACATIONS

Beginning January 1, 2001, the following vacation schedule will apply:

| Length of Service | Weeks |
|---|---|
| Six months but less than 1 year | 1 week |
| 1 year but less than 5 years | 2 weeks |
| 5 years but less than 15 years | 3 weeks |
| 15 years but less than 25 years | 4 weeks |
| 25 years or more | 5 weeks |

1. The plant may shut down for a week of vacation each year. However if this becomes necessary the week will be set and announced prior to February 1st of that year.

If a week of vacation shutdown becomes necessary then all employees entitled to one week shall take such vacation at the time of the plant shutdown except those employees assigned to the Maintenance Department, who may be required to work during the plant shutdown; or those employees with less than one week vacation who may be needed for general clean-up or inventory. Maintenance employees who are required to work the shutdown week must take at least one of their vacation weeks as a solid week either before or after shutdown of that year.

Employees eligible for second, third, fourth or fifth weeks of vacation, or those requesting vacation at times other than during the shutdown week, will submit to their foreman their requested date for such vacation no later than February 15th of each year. Such vacation shall, so far as convenient for plant operation, be granted at the times most desired by the employee entitled thereto in accordance with the seniority list of the employee's department. However, the Company will allow unlimited vacation selection during the first week of Buck Season, for all employees with two or more weeks vacation, if they desire.

All vacations are to be taken and the employee must take all the time off to which he is entitled under this Agreement

### Six (6) Months Service

2. Employees hired before July 1 of any given year will be granted one week of vacation time, after their probationary period, and need not wait the full six months to take vacation with pay calculated at forty (40) times his present regular hourly rate. If the employee quits before working the full six months and has already taken vacation this previously paid vacation will be deducted from his final check. Employees hired after July 1 of any given year will not be granted vacation in their hiring year but will be eligible for two weeks of vacation pay beginning in the year in which the first (1) anniversary of his employment falls.

### One Year Service

3. Each employee who has worked at least forty (40) out of the fifty-two (52) weeks prior to January 1st of each year, shall be entitled to two (2) weeks vacation with pay calculated at eighty (80) times his present regular hourly rate.

### Five Years Service

4. Each employee shall be entitled to three (3) weeks vacation with pay beginning in the calendar year in which the fifth (5th) anniversary of his employment falls, provided he has been on the payroll of the Company continuously during said period, and is on the payroll as of January 1st. of that year, and provided that he worked forty (40) out of the previous fifty-two (52) weeks. Said vacation pay shall be calculated at one hundred twenty (120) times his present regular hourly rate.

### Fifteen Year's Service

5. Each employee shall be entitled to four (4) weeks vacation with pay beginning in the calendar year in which the fifteenth (15th) anniversary of his employment falls, provided he has been on the payroll of the Company continuously during said period and is on the payroll as of January 1st of that year, and provided that he worked forty (40) out of the previous fifty-two (52) weeks. Said vacation pay shall be calculated at one hundred sixty (160) times his present regular hourly rate.

### Twenty Five Year's Service

6. Each employee shall be entitled to five (5) weeks vacation with pay beginning in the calendar year in which the twenty fifth (25th) anniversary of his employment falls, provided he has been on the payroll of the Company continuously during said period, and is on the payroll as of January 1st of that year, and provided he has worked forty (40) out of the previous fifty-two (52) weeks. Said vacation pay shall be calculated at two hundred (200) times his present straight time hourly rate.

7. Any employee who has over one week of vacation is eligible to take his vacation in individual days off and will be paid for the days taken when that week's check is normally due. This will not count against their absentee record if the Company is notified at least three (3) working days in advance.  If there is not a shutdown employees with one week can take individual days also.

## Plant Shutdown

8. If there is a plant shut down employees not entitled to a vacation pay for the full shutdown period shall be entitled to file for Unemployment Compensation, provided they qualify.

## Night Shift Premium

9. Employees entitled to night shift premium at the time of their vacation will receive this payment for all vacation hours taken while on that shift.

## Resignation or Discharge

10 (a). If an employee has at least one year's service prior to January 1st of each year, and he terminates his employment before working forty (40) of the subsequent fifty-two (52) weeks by January 1st of that year, he shall be entitled to a reduced vacation pay of one-fortieth (1/40th) for each week worked to a maximum of forty (40) weeks, if he gives the Company a one (1) week written notice of such resignation.

(b) Any employee who is discharged prior to taking his vacation shall be entitled to his vacation pay if he has earned it by having worked forty (40) out of the fifty-two (52) weeks prior to January 1st of the year in which he was discharged.

## Vacation Period

11. A week's vacation shall consist of seven (7) consecutive days, except as noted in Section 7 of this Article. Holidays occurring during any employee's vacation week shall be counted as part of his vacation. However, if said holiday is one of the designated paid holidays for which employee is entitled to pay, the employee will receive his holiday pay in addition to his vacation pay for that day.

## Proportionate Proviso

12. Employees on the payroll on January 1, who, during the previous fifty-two (52) weeks, were prevented from working forty (40) weeks because of layoff, accident (except compensable accident) or sickness shall have their vacation pay reduced one fortieth (1/40th) for each week less than said forty (40) weeks. If an employee becomes eligible for retirement and is retired before January 1st of any year, thus being prevented from working forty (40) weeks during the fifty-two (52) weeks preceding January 1st, he shall receive his full vacation pay providing he has worked at

least twenty (20) weeks during the vacation year; otherwise his vacation pay shall be reduced one fortieth (l/40th) for each week less than the forty (40) weeks which he worked during said fifty-two (52) week period.

## Vacation Pay

13. Vacation compensation shall be paid to each employee on the last day worked prior to his vacation time, or on the regular pay day prior to the beginning of such vacation.

14. Vacations shall be counted as time worked for the purpose of computing vacations.

## ARTICLE IX
## SENIORITY

### Computation

1. Seniority is defined as the continuous time during which an employee is on the seniority list of the Company.

### Break In Continuous Service

2. An employee's continuous service with the Company shall cease upon:

(a) Justifiable discharge

(b) Voluntary quitting

(c) Absence from active service for three (3) consecutive days without notifying the Company's Human Resources Department. (This does not, however, relieve an employee of their obligation to notify the Company within the first two (2) hours of their shift, on each day of an intended absence.)

(d) Leave of absence for a period of more than three (3) months, except where such leave of absence is granted for industrial or non-industrial injury or illness in which case the leave of absence is capped at two (2) years or the length of the employee's seniority whichever is less.

(e) Failure of an employee to notify the Company within three (3) calendar days that he will return to work and failure to return to work upon recall within seven (7) days after written notice by registered mail is sent to him by the Company at his last known address appearing on his records.

(f) Absence due to layoff for a period of time greater than the employee's length of service at the time of layoff or five (5) years whichever is less.

### Trial Period - Rehiring

3. When an employee, whose continuous service has been broken by any of the above named causes, is rehired, he shall begin as a new employee and his seniority shall be calculated from the date of such rehiring.

## Seniority List

4. On or about February 1 and August 1 of each year, the Company shall compile a Seniority List of employees covered hereby, post the same on the official bulletin boards of the Company and supply a copy thereof to the Union. All complaints with respect to such lists shall be made by the employee involved, in writing, to the Company within thirty (30) days from the date the list is posted, or if the employee is absent at the time of posting, within thirty (30) days of the date of his return to work, and to the extent that such list covers employees with respect to whom no complaints have been made within such thirty (30) day period, the list shall stand as posted and be final until the next posting period.

## Top Seniority

5. In case of layoffs, the Chief Steward and the President of the Local (if an employee of the Company) respectively, shall have plant-wide seniority and shall be the last to be laid off. This preferential seniority to avoid layoff shall not be used for any other purpose and is only meant to replace the least senior employee then on the lowest rated job.

## Seniority in Layoffs

6. Seniority in layoffs shall be applied as set forth in Article XIV.

## Transfer From and To the Unit

7. If a member of the bargaining unit is transferred to a position outside the bargaining unit, he shall maintain the following rights:

(a) To return to the same job he held prior to taking the job outside the bargaining unit within a ninety (90) working days period from the time of the transfer.

(b) The Company shall notify the Union prior to changing an employee from the salary group to the bargaining unit group.

If an employee who has never been employed in a job now covered by this contract is to be transferred to a job within the bargaining unit, his seniority for job bidding and layoff shall date from the date of his employment in the job within the unit.

## ARTICLE X
## LEAVE OF ABSENCE

### Eligibility

1. Any employee who has completed his probationary period and desires a leave of absence without pay, for good cause, including I.U.E. Union business leaves or appointments, shall make such requests in writing to the Human Resources Department. Such request for leave of absence shall be submitted at least two (2) weeks prior, except in case of emergency. The Union shall have the right to determine what are Union activities. No more than one employee may be on a Union leave at any one time.

## Leave of Absence

2. All leaves of absences and extensions thereof shall be determined on length of service, circumstances, needs of employer and/or employee and whatever other factors may enter into the case. The granting of all leave of absences will be at the sole discretion of the Company.

## Seniority While on Leave

3. Seniority shall accrue on leaves of absences as follows:

(a) Industrial or non-industrial injury or illness, his seniority shall accrue, provided he has two (2) years seniority, or more at the time of leave. If his seniority is less than two (2) years, seniority will accumulate up to the total months of seniority at the time of injury or illness.

(b) Personal - up to three (3) months

## Return to Work at Expiration of Leave

4. Any employee who has been on leave due to accident or illness, shall return to his regular job, provided he is physically able to perform the work and, further, provided he has sufficient seniority to do so. If not, he can bump back into a job to which his seniority entitles him, provided he is physically able to perform the work. If not, he will be placed on a job which he can perform in accordance with his seniority.

(a) Employees on leave must notify the Human Resources Department of their return two (2) weeks prior to the end of their leave.

(b) At the termination of the leave of absence, the employees will report to the Human Resources Department during the first work day following the leave of absence. If the leave was granted for illness or accident, the employee must present a doctor's note which states that the employee is physically able to return to work. The Company reserves the right to have the employee examined by the Company's doctor to verify the employee's ability to return to work.

## Other Employment During
## Leave of Absence

5. Any employee who accepts gainful employment while on an authorized leave of absence, except with the Company's written approval, shall lose all his seniority rights and shall be considered to have severed his employment with the Company.

## ARTICLE XI
## HIRING

1. When a new employee is hired, or a former employee is rehired, whose continuous service is broken as set forth in Article IX, he shall be regarded as a temporary or probationary employee for the first forty-five (45) working days of his employment and shall not be entitled to seniority during that period. A temporary or probationary employee may be transferred, suspended, laid off or discharged as exclusively determined by the Company. Upon completion of such probationary period, the seniority of the employee, if retained, shall date from the date of his employment.

## ARTICLE XII
## OPEN JOBS AND ADVANCEMENT

When a vacancy occurs in any job classification a notice will be posted on Company bulletin boards for a period of two (2) working days during which time employees may file a written application for the vacancy with the Human Resources Department listing their qualifications for the job.   Qualifications shall include past experience on work similar to the job vacancy, educational training, skill, ability and experience as an employee at the Company. At the close of the application period, the vacancy shall be filled from among qualified applicants.   Seniority shall be the determining factor if all of the other factors listed above are relatively equal.

Any employee who bids to a higher classification and that employee's rate of pay exceeds the A-3 rate of the new classification, he shall continue to be paid at his present rate until the progression exceeds his present rate.

The employees selected for the job shall receive the A-3 rate of the bid job, except that if the employee previously held the bid job, he shall be placed in the same rate which he last held in that job unless a period of five (5) years has elapsed at which time the employee will start at the A-2 rate.  If as period of ten (10) years or more has elapsed, the employee will start at the A-3 rate.

In the event there are no qualified applicants for the vacancy, the Company may offer the vacancy to qualified non-applicants or fill the vacancy by hiring from the outside.

If the Company determines at any time within thirty (30) days after the successful applicant is assigned to the vacancy that the employee is not qualified to perform the work of that classification, the employee shall be returned to his former job classification and rate and shall have no bid rights to that classification for twelve (12) months.

If a successful applicant terminates or fails to qualify within the thirty (30) day trial period, the Company will fill the vacancy from among the original qualified applicants in the same manner set forth above and will not post the job again.

## ARTICLE XIII
## LAYOFFS

1.  When lack of work necessitates, a reduction in force, employees will be laid off as follows:

    (a)  A senior employee may request a voluntary layoff for a period of not more than three months.  Only one senior employee is allowed to take a voluntary layoff per department per occurrence.  When the senior employee returns at the end of the three months the junior employee in the classification will then be laid off.  Upon returning to work the temporarily laid off employee will be reinstated to his previously held job.  If that job no longer exists, he will be given a bump slip and he can bump into a job he previously held or into a bump-able job (see Appendix A) based on his seniority with no loss of continuous service or seniority.

    (b)  If a senior employee does not request a voluntary layoff then probationary employees within the affected classifications will be laid off first.

    (c)  If further reductions within the affected classifications are required, they shall be governed by the following factors:

        (1)  Seniority

        (2)  Demonstrated skill and ability to perform the remaining work.

When demonstrated skill and ability to perform the remaining work is relatively equal, the employee with the least seniority shall be laid off first.

    (d) An employee who is laid off from one classification may bump a less senior employee in another classification previously held by the laid off employee or a bump able job (See appendix A) provided the laid off employee has the skill and ability to perform the work of that classification.

2.  Employees shall be recalled to the classifications from which they were laid off, any classification previously held or any bump able job (See appendix A) in the reverse order of their layoff.

3. Prior to a reduction in force, or reducing the work week to less than forty (40) hours in any department, the Company and Union Committee will meet to discuss the matter so that the layoff can be made in accordance with seniority and the provisions set forth in this Article.

4. If the Company and the Union Committee mutually agree that an employee is no longer physically or mentally able to perform his job in a satisfactory manner, he shall be assigned to a job that he is capable of filling efficiently, providing the holder of that job has less seniority. The employee so displaced shall be subject to the layoff procedure as defined in this Article.  If mutual agreement is not reached by the Company and the Union Committee, the recommendations of the company physician, after consulting with the employee's physician, shall be followed as to the employee's ability to perform his present and proposed jobs.

## ARTICLE XIV
## SHOP COMMITTEES

The Company agrees to recognize the local officers and Chief Steward, Committeemen and Department Stewards of the I.U.E. as the official representatives of the Union in connection with disputes that may arise between the Company and the Union under this Agreement.

If there shall be changes or replacements of any Shop Stewards or members of the Grievance/Negotiating Committee, the Company shall be so notified, it being the intention of this section that the Company shall know at all times whom it is to bargain or negotiate with for the Union.

The Grievance/Negotiating Committee for the Union shall not exceed a ratio of one (1) committee member (no matter in what capacity) representing each twenty-five (25) hourly Union employees; but never to exceed seven (7) committee members nor less than three (3) unless mutual agreement is obtained.

The Plant Chief Steward shall be an automatic member of the Grievance/Negotiating Committee.

## ARTICLE XV
## DEATH IN IMMEDIATE FAMILY

In case of death of the employee's wife, husband, child, mother, father, sister, brother, mother-in-law, father-in-law, stepmother or stepfather (provided the employee has identified this individual at the time of the signing of this contract or their hire that the stepmother/stepfather raised them from childhood), the employee may be entitled to a minimum of one (1) day's pay (8 hours) to a maximum of three (3) day's pay (24 hours) at the employee's regular hourly rate plus shift bonus (if any) for actual time lost from his regular working schedule on account of such death. In no event will an employee be entitled to an automatic payment of any such pay should a death occur during periods of time that the employee is absent from work and being compensated. (i.e., vacation,

holidays, workers compensation, sickness and accident, etc.). An employee shall not be entitled to such pay unless he attends the funeral; and before he shall be eligible for such pay, he shall make a written application to the Human Resources Department on forms provided by it. Any person making false statements in this application shall be subject to immediate discharge.

## ARTICLE XVI
## GRIEVANCE PROCEDURE

1. Should any difference arise between the Company and the Union concerning the effect, meaning, application, compliance, claim of breach or violation of the Agreement, or any other dispute which may arise between the parties, an earnest effort will be made to settle the same promptly through the following procedure in the order specified.

All grievances must be filed in writing within ten (10) working days from the date of their occurrence or the date on which the Grievant became aware, or should have become aware, of the facts giving rise to the Grievance. Grievances not so filed shall deemed to have been waived and shall not be raised thereafter.

Grievances shall be disposed of in four (4) steps:

### Step I

Oral Discussion between the employee, steward, and his immediate supervisor. If the dispute is not settled, it shall be submitted to Step II within two (2) working days from the date of the oral discussion.

### Step II

The grievance shall be reduced to writing and submitted to the department supervisor who shall act upon it within two (2) working days. If the matter is not then settled, the grievance shall be submitted under Step III within three (3) working days after receiving an answer to Step II.

### Step III

The grievance shall be presented in writing by the Chief Steward and Departmental Steward specifying the Article and section of the contract, alleged to be violated, to the Human Resources Manager, or his representative. A meeting shall be held within three (3) working days with the Union Committee, which may include an I.U.E. representative, and an answer given in writing within two (2) working days after said meeting. If the matter is not thereby settled, it shall be submitted under Step IV.

### Step IV

Should the Company and Union fail to settle any dispute or grievance after completing the above procedure, the matter may be submitted to arbitration within thirty (30) working days of the Company's answer, as outlined in Step III above, or such extended period as the parties may

mutually agree upon. Only grievances involving the interpretation or application of express provisions of this Agreement shall be subject to Arbitration.

## Arbitration

2. Grievances can be referred to arbitration by either party. Selection of an arbitrator shall be done in the following manner:

A. The parties will jointly request the American Arbitration Association to submit a panel of seven (7) arbitrators from which a single arbitrator will be selected to hear the dispute.

B. The Company and the Union shall, within seven (7) working days after receipt of said panel, select an arbitrator by agreement, or failing agreement, by striking names.

C. The arbitration shall be held at the earliest possible date acceptable to the arbitrator, the Union, and the Company; and the aforementioned parties shall not unnecessarily delay the hearing date.

## Limitations

3. The arbitrator shall have no power to alter, amend, change, add to or subtract from any of the provisions of this Agreement. The Company or the Union may call the aggrieved employee and his immediate supervisor, plus witnesses, into any of the meetings provided for in the foregoing Steps I, II, III. Grievances shall be handled only in accordance with the form thereof as presented.

## Discharge Procedure

4. In the case of a discharge for just cause, the discharged employee may confer with the Chief Steward before he leaves the plant by going to the Human Resources Department and stating this desire. The Human Resources Department will call the Chief Steward to come to the Human Resources Department as quickly as possible. If a grievance should develop over the discharge, it should start at Step III.

If not satisfactorily settled at such meeting, a grievance shall be submitted to arbitration in accordance with the foregoing procedure under Step IV and the Arbitrator shall have the power to determine whether or not such employee is to be reinstated; and if so, the amount of back pay, if any, to which he is entitled. If such employee is reinstated, he shall be entitled to his full seniority rights.

## General

5. Grievances of a departmental or shop-wide nature and complaints or grievances which the Company may have against the Union, shall start with Step III of the foregoing Grievance Procedure; and special grievance meetings may be called at any time by mutual consent.

## Grievance or Arbitration Pay

6. All employees required for the discussion of grievances during working hours will not suffer loss while attending such meetings. No employees shall be paid by the Company for time spent in arbitration case except when specifically requested by the Company to attend such meetings.

## ARTICLE XVII
## SICK LEAVE

1. Effective 1/1/2001 all union employees shall be eligible for two (2) sick days per year.

2. An eligible employee shall be entitled to receive sick leave benefits in the amount of eight (8) hours straight-time pay for each full day of disability due to sickness or accident beginning with the first full regular scheduled work day lost for such absence.

3. The Company may require verification by a medical doctor before paying sick leave benefits. Sick leave benefits will be paid at the rate of straight-time less any disability insurance compensation due to non-occupational sickness or injury to which the employee may be entitled for the same period. Sick days not used by the end of each calendar year will be forfeited.

4. Beginning January 1, 2001, Flowserve will provide two personal days per year that you may use to conduct personal business. Personal days can not be carried over from year to year and any days not used by the end of each calendar year will be forfeited. Personal days for new hires are available after the completion of their probationary period. Like vacation time, personal days will need approved through your supervisor. Personal days must be taken in full eight hour increments.

## ARTICLE XVIII
## SAFETY AND HEALTH CONDITIONS

1. The Company agrees to make every reasonable effort to protect the health and safety of employees during their working hours. The Company, the Union and the employees recognize their obligations under existing Federal and State laws with respect to safety and health matters and all employees will observe the safety regulations and rules as prescribed by the Company for its operation. A Safety Committee will be established between the Company and the Union, consisting of three (3) employees appointed by the Company and three (3) by the Union. The Company agrees to furnish safety equipment it deems necessary at no cost to the employee.

## ARTICLE XIX
## BULLETIN BOARDS

The Company shall continue to provide centrally located bulletin boards for posting of job bids, notices, etc. The Company will provide two (2) bulletin boards for use by the Union,



providing, however, that all material be submitted to the Human Resources Manager of the Company for approval of the content prior to posting. The Union shall use such boards as aforesaid to the end that employees will not be interrupted at their work.

## ARTICLE XX
## SEPARABILITY AND SAVINGS CLAUSE

If any Article or Section of this Agreement or any amendments thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, of if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any amendments thereto or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of or compliance with which has been restrained as above set forth, the parties affected thereby shall enter into immediate collective bargaining negotiations, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint.

In the event the parties are unable to agree upon a replacement, the dispute may be referred to arbitration pursuant to Article XVI of this Agreement.  Provided, however, the power of the arbitrator shall be restricted and limited to determining a replacement to provide for the same specific objective and purpose as the original Article or Section.

## ARTICLE XXI
## STRIKES AND LOCKOUTS

1. The Company agrees not to lock out any of its employees while this Agreement is in effect.

2. The Union agrees not to call any strike or conduct any slowdown or work stoppage while this Agreement is in effect and will take all necessary steps to prevent or stop its members from such activity promptly.

## ARTICLE XXII
## LEADMEN

<u>Article is deleted.</u>

## ARTICLE XXIII
## RETIREMENT PLAN

The Company agrees to provide a pension plan to all eligible employees during the duration of the Agreement.

## ARTICLE XXIV
## GROUP INSURANCE

The Company agreed to provide group insurance coverage for life, medical, dental and short term <u>and long</u> term disability benefits, as described in the applicable booklets, to all eligible employees during the duration of this Agreement.

The Company will pay the monthly premium costs of the Group Health and <u>Dental</u> Plans less any agreed co-payment by the employee by means of a payroll deduction. <u>See Appendix B for effective dates and co-payment amounts  for June 3, 2000, January 1, 2001, January 1, 2002 and January 1, 2003:</u>

## ARTICLE XXV
## WAIVER

The parties hereby acknowledge and affirm that during the negotiations which led to this Agreement, each of them had the unlimited right and opportunity to formulate demands and proposes with respect to all subjects or mattes not excluded by law from the collective bargaining area, and that all decisions and covenants reached by them through the use of such rights and opportunities appear in this Agreement.  Therefore, it is agreed that the items herein set forth <u>and all memorandums of understanding date June 3, 2000</u> contain the complete agreement between the parties for the term of this Agreement.  The right to present any demands or proposals on any matters, whether or not discussed during the negotiations  which led to this Agreement, are hereby waived by the Company and the Union for the term of this Agreement.  However, nothing in this clause precludes the parties from making changes in this Agreement by mutual consent upon written request by one party and written acceptance by the other party.

## ARTICLE XXVI

## DURATION OF AGREEMENT

This contract shall remain in effect until midnight, <u>May 31, 2003</u> and shall thereafter continue to be in effect from year to year, unless either party shall give the other party sixty (60) days written notice before the end of the contract period, or yearly renewal of its intention to modify or terminate the same. In the event of such modification or termination notice, negotiations shall begin for a new agreement at least thirty (30) days before the termination of the old agreement.

IN WITNESS WHEREOF, the parties hereto have executed the foregoing agreement this 3rd day of June 2000.

FLOWSERVE CORPORATION FCD WILLIAMSPORT


BY:    HARVEY GEIB
       Human Resource Manager


BY:    JEFFREY WINGATE
       Manufacturing Manager


BY:    RANDY GARRETT
       Controller



**INTERNATIONAL UNION OF ELECTRONIC,
ELECTRICAL, SALARIED,MACHINE &
FURNITURE WORKERS,
AFL-CIO
AND
LOCAL UNION NO. 628**

BY:    **JOE KATULA**
          International Union Representative

BY:    **GARY WOLESLAGLE**
          President Local 628

BY:    **DAVE SCHNEIDER**
          Chief Steward

BY:    **KEITH LAIELLI**
          Vice President

BY:    **JOHN WILHELM**
          Committeeman

BY:    **DON LOUDENSLAGER**
          Committeeman

BY:    **DAVID HALL**
          Committeeman

APPENDIX A
JOBS AND GRADE SCHEDULES—JUNE 5, 2000

| Labor Grade | Job Classifications | A-3 | Progression | A-2 | Progression | A-1 |
|---|---|---|---|---|---|---|
| 3 | Janitor** | 14.70 | 30 days | 15.34 | 30 days | 16.00 |
| 4 | Valve Technician** | 15.42 | 60 days | 16.02 | 60 days | 16.63 |
|  | (*) Shipper |  |  |  |  |  |
|  | (*) Storeman |  |  |  |  |  |
|  | (*) Grinder |  |  |  |  |  |
|  | (*) Material Handler |  |  |  |  |  |
| 5 | Assembler/Certified Tester | 15.42 | 60 days | 16.02 | 60 days | 16.63 |
| 6 | Inspector | 15.60 | 60 days | 16.21 | 60 days | 16.81 |
| 7 | Machinist (Small) | 15.73 | 120 days | 16.42 | 120 days | 17.11 |
|  | (*) Turret Lathe |  |  |  |  |  |
|  | (*) Engine Lathe |  |  |  |  |  |
|  | (*) Surface Grinder |  |  |  |  |  |
|  | (*) Mills |  |  |  |  |  |
|  | (*) Drills |  |  |  |  |  |
|  | (*) Tool Grinder |  |  |  |  |  |
| 8 | Machinist N/C | 15.87 | 120 days | 16.60 | 120 days | 17.32 |
|  | (*) N/C Tape Lathe |  |  |  |  |  |
|  | (*) N/C Mills |  |  |  |  |  |
| 8 | Machinist (Large) | 15.87 | 120 days | 16.60 | 120 days | 17.32 |
|  | (*) Vertical Boring Mills |  |  |  |  |  |
|  | (*) Horizontal Boring Mills |  |  |  |  |  |
|  | (*) CNC Vertical Boring Mill |  |  |  |  |  |
| 8 | Tool Maker | 15.87 | 120 days | 16.60 | 120 days | 17.32 |
| 9 | Welder | 16.22 | 120 days | 16.95 | 120 days | 17.67 |
| 9 | Maintenance/Electrician | 16.22 | 120 days | 16.95 | 120 days | 17.67 |

(*) Functions within each classification  (**) Bump able jobs based on seniority.

24

## APPENDIX A
## JOBS AND GRADE SCHEDULES—JUNE 4, 2001

| Labor Grade | Job Description | A-3 | Progression | A-2 | Progression | A-1 |
|---|---|---|---|---|---|---|
| 3 | Janitor | 15.14 | 30 days | 15.80 | 30 days | 16.48 |
| 4 | Valve Technician<br>(*) Shipper<br>(*) Storeman<br>(*) Grinder<br>(*) Material Handler | 15.88 | 60 days | 16.50 | 60 days | 17.13 |
| 5 | Assembler/Certified Tester | 15.88 | 60 days | 16.50 | 60 days | 17.13 |
| 6 | Inspector | 16.07 | 60 days | 16.70 | 60 days | 17.31 |
| 7 | Machinist (Small)<br>(*) Turret Lathe<br>(*) Engine Lathe<br>(*) Surface Grinder<br>(*) Mills<br>(*) Drills<br>(*) Tool Grinder | 16.20 | 120 days | 16.91 | 120 days | 17.62 |
| 8 | Machinist N/C<br>(*) N/C Tape Lathe<br>(*) N/C Mills | 16.35 | 120 days | 17.10 | 120 days | 17.84 |
| 8 | Machinist (Large)<br>(*) Vertical Boring Mills<br>(*) Horizontal Boring Mills<br>(*) CNC Vertical Boring Mill | 16.35 | 120 days | 17.10 | 120 days | 17.84 |
| 8 | Tool Maker | 16.35 | 120 days | 17.10 | 120 days | 17.84 |
| 9 | Welder | 16.70 | 120 days | 17.46 | 120 days | 18.20 |
| 9 | Maintenance/Electrician | 16.70 | 120 days | 17.46 | 120 days | 18.20 |

(*) Functions within each classification

APPENDIX A

JOBS AND GRADE SCHEDULES—JUNE 3, 2002

| Labor Grade | Job Description | A-3 | Progression | A-2 | Progression | A-1 |
|---|---|---|---|---|---|---|
| 3 | Janitor | 15.59 | 30 days | 16.27 | 30 days | 16.97 |
| 4 | Valve Technician | 16.37 | 60 days | 17.00 | 60 days | 17.64 |
| 5 | (*) Shipper (*) Storeman (*) Grinder (*) Material Handler | | | | | |
| 5 | Assembler/Certified Tester | 16.37 | 60 days | 17.00 | 60 days | 17.64 |
| 6 | Inspector | 16.55 | 60 days | 17.20 | 60 days | 17.83 |
| 7 | Machinist (Small) | 16.69 | 120 days | 17.42 | 120 days | 18.15 |
| | (*) Turret Lathe (*) Engine Lathe (*) Surface Grinder (*) Mills (*) Drills (*) Tool Grinder | | | | | |
| 8 | Machinist N/C | 16.84 | 120 days | 17.61 | 120 days | 18.38 |
| | (*) N/C Tape Lathe (*) N/C Mills | | | | | |
| 8 | Machinist (Large) | 16.84 | 120 days | 17.61 | 120 days | 18.38 |
| | (*) Vertical Boring Mill (*) Horizontal Boring Mills (*) CNC Vertical Boring Mill | | | | | |
| 8 | Tool Maker | 16.84 | 120 days | 17.61 | 120 days | 18.38 |
| 9 | Welder | 17.20 | 120 days | 17.98 | 120 days | 18.75 |
| 9 | Maintenance/Electrician | 17.20 | 120 days | 17.98 | 120 days | 18.75 |

(*) Functions within each classification

26

## Medical Insurance
## Employee Contribution

| | | Present Yearly | Present Monthly | June, 2000 Yearly | June, 2000 Monthly | Jan., 2001 Yearly | Jan., 2001 Monthly | Jan., 2002 Yearly | Jan., 2003 Yearly |
|---|---|---|---|---|---|---|---|---|---|
| No Coverage | Employee | N/A | 0 | N/A | N/A | -$700.00 | -$58.33 | | |
| | Employee + 1 | N/A | 0 | N/A | N/A | -$700.00 | -$58.33 | | |
| | Employee + 2+ | N/A | 0 | N/A | N/A | -$700.00 | -$58.33 | | |
| Catastrophic | Employee | | | | | -$196.00 | -$16.33 | * | * |
| | Employee + 1 | | | | | $149.31 | $12.44 | * | * |
| | Employee + 2+ | | | | | $502.39 | $41.87 | * | * |
| Aetna EPO | Employee | $144.00 | $12.00 | $168.00 | $14.00 | $372.86 | $31.07 | * | * |
| | Employee + 1 | N/A | 0 | N/A | N/A | $813.15 | $67.76 | * | * |
| | Employee + 2+ | $284.00 | $22.00 | $583.00 | $48.58 | $1,273.12 | $106.09 | * | * |
| Aetna POS | Employee | N/A | 0 | N/A | N/A | $453.97 | $37.83 | * | * |
| | Employee + 1 | N/A | 0 | N/A | N/A | $980.83 | $81.74 | * | * |
| | Employee + 2+ | N/A | 0 | N/A | N/A | $1,538.64 | $128.22 | * | * |
| Aetna PPO | Employee | N/A | 0 | N/A | N/A | $659.88 | $54.99 | * | * |
| | Employee + 1 | N/A | 0 | N/A | N/A | $1,396.29 | $116.36 | * | * |
| | Employee + 2+ | N/A | 0 | N/A | N/A | $2,200.85 | $183.40 | * | * |
| Out-of-Area | Employee | $144.00 | $12.00 | $254.00 | $21.17 | $531.23 | $44.27 | * | * |
| | Employee + 1 | N/A | 0 | N/A | N/A | $1,126.03 | $93.84 | * | * |
| | Employee + 2+ | $284.00 | $22.00 | $807.00 | $67.25 | $1,780.31 | $148.36 | * | * |

* Yearly employee contributions will not exceed 15% on aggregate of previous years employee contributions based on option selected.

**APPENDIX B**

Dental Insurance
Employee Contribution

| Dental | | Present Yearly | Present Monthly | June, 2000 Yearly | June, 2000 Monthly | Jan., 2001 Yearly | Jan., 2001 Monthly | Jan., 2002 Yearly | Jan., 2003 Yearly |
|---|---|---|---|---|---|---|---|---|---|
| | Employee | N/A | 0 | $44.00 | $3.67 | $45.76 | $3.81 | * | * |
| | Employee + 1 | N/A | 0 | $100.00 | $8.33 | $104.00 | $8.67 | * | * |
| | Employee + 2+ | N/A | 0 | $144.00 | $12.00 | $149.76 | $12.48 | * | * |

* Yearly employee contributions will not exceed 15% on aggregate of previous years employee contributions based on option selected.

**APPENDIX B**

7:06 AM

06/03/2000

## MEDICAL CONTRIBUTION OFF-SET

### 01-Jan-01
**Medical Plans off-set**

$ 250.00 Employee Only
$500.00 Employee Plus One
$750.00 Employee Plus Two
$0 Opt. Out

### 01-Jan-02
**Medical Plans off-set**

$ 250.00 Employee Only
$500.00 Employee Plus One
$750.00 Employee Plus Two
$0 Opt. Out

### 01-Jan-03
**Medical Plans off-set**

$ 100.00 Employee Only
$250.00 Employee Plus One
$500.00 Employee Plus Two
$0 Opt. Out

New Hires after June 3, 2000
Will not receive off-set

06/03/2000

9:57 AM

## Memorandum of Understanding
## June 3, 2000

Should no fully qualified Flowserve machinist bid a small machinist opening the Company will give an opportunity to the senior Flowserve employee who has successfully completed the following Penn College courses: MTT 110, MTT 115, EDT 110, MTH 111, MTT 120, and MTT 210 or who has equivalent machining work experience.

Should no fully qualified Flowserve Machinists bid an NC Machinist opening an opportunity will be given to the senior Flowserve employee who has successfully completed the above courses plus the following Penn College courses: CIM 101, CIM 121 and CIM 122 or who has equivalent machining work experience.

_Harvey Zeit_ 5/24/00
**For the Company**

_Joe Katt_ 5/24/00
**For the Union**

# Memo of Understanding
## June 3, 2000
## NEW HIRE ORIENTATION

The company and the union have agreed to the following

The union's chief steward or vice president, will be given the opportunity to meet with a new bargaining unit employee on work time at the conclusion of the new employee's probationary period.  The meeting will last no longer than one (1) hour.  If more than one employee is hired in a given pay period a group meeting will be held at the conclusion of the last hired person in that pay period entrance into the bargaining unit.  The company will post advance notices of said scheduled meetings on its bulletin boards with the date, time and place where said union representative will be available.   The company will notify the union of all new union members and shall permit a meeting with the new union employees as stated above.

_____ 5/24/00                    _____ 5/24/--
For the Company                              For the Union

# MEMO OF UNDERSTANDING
## JUNE 3, 2000

The company and the union have agreed to the following

The company and the union have agreed in order to promote fairness and good faith between the parties the company will expunge all disciplinary records from employees files that occurred prior to January 1, 1997.

_____ 5/24/00
For the Company

_____ 5/31/00
For the Union

**Memorandum of Understanding**
**June 3, 2000**

Should no qualified Flowserve Inspector bid an Inspector opening the Company will give an opportunity to the senior Flowserve machinist with at least two (2) years Flowserve machining experience.  If the successful candidate is not a qualified Inspector then this candidate must remain an Inspector for a period of two (2) years after becoming qualified or a maximum of three (3) years before becoming eligible to bid outside the department.

_____ 6/1/00

**For the Company**

_____

**For the Union**

## Memorandum of Understanding
## Progressive Discipline
## June 3, 2000

The company and the union have agreed that in all progressive discipline cases, three years without additional violations from the last infraction will reduce the level of discipline one step.  (Example- If an employee has received a disciplinary suspension and three years go by without additional violations the next infraction would be another disciplinary suspension).

_____ 6/1/00                    _____ 6/1/0
**For the Company**                       **For the Union**

## Memorandum of Understanding
### June 3, 2000

The Union and Company have agreed to following as it relates to the Maintenance Department:

The maintenance crew at Flowserve, Williamsport will have one Certified, Qualified Electrician on the crew at all times.  If the present certified, qualified electrician leaves the company or bids out of the department the job will be posted and qualified candidate will meet the 19 point job description for Maintenance Man/Electrician.  If an opening occurs in the maintenance department other than the certified, qualified electrician the job will be posted and the successful candidate will meet the 12 point job description for maintenance man/electrician. See attached job descriptions.

_____ 6/1/00
**For the Company**

_____ 6/1/0
**For the Union**

## MAINTENANCE MAN/ELECTRICIAN

1.  Must be able to read blueprints.
2.  Must be able to perform and apply shop mathematics.
3.  Examine the plant equipment as directed by the supervisor to locate the source of trouble.
4.  Determine the actions necessary to restore the equipment to operating conditions, reporting any major repairs necessary to the supervisor.
5.  Restore the equipment by repairing or replacing defective parts and reassemble and adjusting to proper operating condition.
6.  Produce parts as capable, using a variety of equipment (lathes, drill press, drills, grinders, saws, weld-cutting apparatus, pipe threading machine, etc.) to make replacement parts or modification parts.
7.  Layout work as necessary to plan the installation or modification of equipment.
8.  Install new equipment and dismantle and reinstall existing equipment under the guidance of the supervisor.
9.  Perform periodic checks of equipment and periodically replace parts to prevent failure.
10. Paint the plant equipment as directed by the supervisor.
11. Two (2) years experience Industrial Maintenance or equivalent experience.
12. Perform other related duties as directed by the supervisor.

## MAINTENANCE MAN/ELECTRICIAN

1. Must be able to read blueprints.
2. Must be able to perform and apply shop mathematics.
3. Examine the plant equipment as directed by the supervisor to locate the source of trouble.
4. Determine the actions necessary to restore the equipment to operating conditions, reporting any major repairs necessary to the supervisor.
5. Restore the equipment by repairing or replacing defective parts and reassemble and adjusting to proper operating condition.
6. Produce parts as capable, using a variety of equipment (lathes, drill press, drills, grinders, saws, weld-cutting apparatus, pipe threading machine, etc.) to make replacement parts or modification parts.
7. Layout work as necessary to plan the installation or modification of equipment.
8. Install new equipment and dismantle and reinstall existing equipment under the guidance of the supervisor.
9. Perform periodic checks of equipment and periodically replace parts to prevent failure.
10. Paint the plant equipment as directed by the supervisor.
11. Associate Degree Electrical Technology or equivalent.
12. Five (5) years experience Industrial Electrical Maintenance.
13. Install and maintain all types of electrical and electronic equipment.
14. Troubleshoot power supplies and plant power distribution system including high voltage equipment.
15. Troubleshoot problems involving AC & DC circuits, three-phase and single-phase electrical equipment, programmable controls and instrumentation.
16. Read and interpret schematics, wiring diagrams and electrical prints.
17. Knowledge and use of appropriate analog and digital meters and oscilloscopes to diagnose a wide range of electrical problems.
18. Working knowledge of printed circuits, SCR drives, resolvers, tachometers and related feedback devices, magnetic switches and other electrical components.
19. Perform other related duties as directed by the supervisor.

## TABLE OF CONTENTS

**PAGE**

Arbitration .................................................................................................................... 16

Break In Continuous Service.............................................................................................. 10

Bulletin Boards 18

Call-In Pay .................................................................................................................... 4

Checkoff ....................................................................................................................... 3

Compensation ................................................................................................................ 4

Coverage ....................................................................................................................... 2

Death in Immediate Family.............................................................................................. 15

Discharge Procedure ....................................................................................................... 17

Distribution ................................................................................................................... 6

Duration of Agreement ................................................................................................... 20

Employees Covered ........................................................................................................ 2

Extra Shifts ................................................................................................................... 5

Grievance or Arbitration Pay............................................................................................ 17

Grievance Procedure ....................................................................................................... 15

Group Insurance............................................................................................................. 19

Hiring .......................................................................................................................... 13

Holidays ....................................................................................................................... 6

Hours and Overtime ....................................................................................................... 5

Interference Proviso ........................................................................................................ 3

Jury Duty ...................................................................................................................... 5

Layoffs .................................................................................... 14

Leadman ................................................................................. 19

Leave of Absence .................................................................... 12

Limitations .............................................................................. 17

Management ............................................................................ 3

Night Shift Premium ................................................................ 9

Non-Discrimination ................................................................. 3

Open Jobs and Advancement ................................................... 13

Overtime ................................................................................. 5

Plant Shutdown ....................................................................... 8

Proportionate Proviso .............................................................. 9

Recall ...................................................................................... 14

Recognition of Union ............................................................... 2

Report Pay .............................................................................. 4

Resignation or Discharge ......................................................... 9

Retirement Plan ....................................................................... 19

Safety and Health Conditions .................................................. 18

Seniority .................................................................................. 10

Seniority in Layoffs ................................................................. 11

Seniority List ........................................................................... 11

Seniority While on Leave .......................................................... 12

Separability and Savings Clause ............................................... 18

Shop Committees ..................................................................... 15

Strikes and Lockouts ........................................................................................... 19

Temporary Assignment ....................................................................................... 4

Top Seniority ...................................................................................................... 11

Training Program ................................................................................................ 13

Trial Period – Rehiring ...................................................................................... 10

Union Shop .......................................................................................................... 2

Vacation Pay ....................................................................................................... 9

Vacation Period ................................................................................................... 9

Vacations ............................................................................................................. 7

Wages .................................................................................................................. 4

Waiver ................................................................................................................. 19

## Memorandum of Understanding
## Reached during Negotiations

**Effective July 1, 2000 the hourly union employee 401K match will increase from 25% to 50% of the first 6% of pay you contribute.**


*Harvey K. Geib*

Harvey K. Geib

| MEDICAL CONTRIBUTION | OFFSET | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| NO COVERAGE | copay yr 2001 | copay mo 2001 | offset yr | copay yr 2002 | copay mo 2002 | offset yr | copay yr 2003 | copay mo 2003 | offset yr |
| EMPLOYEE | -700 | -58.33 | 0 | -700 | -58.33 | 0 | -700 | -58.33 | 0 |
| EMPLOYEE + 1 | -700 | -58.33 | 0 | -700 | -58.33 | 0 | -700 | -58.33 | 0 |
| FAMILY | -700 | -58.33 | 0 | -700 | -58.33 | 0 | -700 | -58.33 | 0 |
| **CATASTROPHIC** | | | | | | | | | |
| EMPLOYEE | -196 | -16.33 | -250 | -196 | -16.33 | -250 | -196 | -16.33 | -100 |
| EMPLOYEE + 1 | 149.31 | 12.44 | -500 | 171.71 | 14.31 | -500 | 197.47 | 16.45 | -250 |
| FAMILY | 502.39 | 41.87 | -750 | 577.75 | 48.15 | -750 | 664.41 | 55.37 | -500 |
| **AETNA EPO** | | | | | | | | | |
| EMPLOYEE | 372.86 | 31.07 | -250 | 428.79 | 35.73 | -250 | 493.11 | 41.09 | -100 |
| EMPLOYEE + 1 | 813.15 | 67.76 | -500 | 935.12 | 77.93 | -500 | 1075.39 | 89.62 | -250 |
| FAMILY | 1273.12 | 106.09 | -750 | 1464.09 | 122.01 | -750 | 1683.7 | 140.31 | -500 |
| **AETNA POS** | | | | | | | | | |
| EMPLOYEE | 453.97 | 37.83 | -250 | 522.07 | 43.51 | -250 | 600.38 | 50.03 | -100 |
| EMPLOYEE + 1 | 980.83 | 81.74 | -500 | 1127.95 | 94 | -500 | 1297.14 | 108.1 | -250 |
| FAMILY | 1538.64 | 128.22 | -750 | 1769.44 | 147.45 | -750 | 2034.86 | 169.57 | -500 |
| **AETNA PPO** | | | | | | | | | |
| EMPLOYEE | 659.88 | 54.99 | -250 | 758.86 | 63.24 | -250 | 872.69 | 72.72 | -100 |
| EMPLOYEE + 1 | 1396.29 | 116.36 | -500 | 1605.73 | 133.81 | -500 | 1846.59 | 153.88 | -250 |
| FAMILY | 2200.85 | 183.4 | -750 | 2530.98 | 210.91 | -750 | 2910.63 | 242.55 | -500 |
| **OUT OF AREA** | | | | | | | | | |
| EMPLOYEE | 531.23 | 44.27 | -250 | 610.91 | 50.91 | -250 | 702.55 | 50.55 | -100 |
| EMPLOYEE + 1 | 1126.03 | 93.84 | -500 | 1294.93 | 107.91 | -500 | 1489.17 | 124.1 | -250 |
| FAMILY | 1780.31 | 148.36 | -750 | 2047.36 | 170.61 | -750 | 2354.47 | 196.21 | -500 |
| **DENTAL** | | | | | | | | | |
| EMPLOYEE | 45.76 | 3.81 | | 51.47 | 4.29 | | 59.19 | 4.93 | |
| EMPLOYEE + 1 | 104 | 8.67 | | 119.6 | 9.97 | | 137.54 | 11.46 | |
| FAMILY | 149.76 | 12.48 | | 172.22 | 14.35 | | 198.05 | 16.5 | |

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IUE-CWA, LOCAL 628<br>429 West Third Street<br>Williamsport, PA 17701       :<br>Plaintiff,    :<br>    :<br>v.    :<br>FLOWSERVE CORPORATION OF PENNSYLVANIA    :<br>701 First Street<br>Williamsport, PA 17701    :<br>Defendant    : | CIVIL ACTION<br><br>No. _____ |

## AFFIDAVIT

I, Keith A. Laielli, being duly sworn, state the following:

1.      I am the President of IUE-CWA Local 628 (Local 628).

2.      I have been employed by the Flowserve Corporation on 701 First Street, Williamsport, PA since November 12, 1990.

3.      My current job title is "machinist".

4.      I have served as President of Local 628 since November 1, 2001. Prior to that date I served as Vice-President of the Local.

5.      Local 628 and Flowserve Corporation are parties to a Collective Bargaining Agreement (CBA) running from June 3, 2000 through May 31, 2003.

6.      On or about July 9, 2002 at about 7:55 a.m., Jeff Wingate, Flowserve Plant Manager, called the Local 628 union committee to the company conference room.

7.      In the conference room, Harvey Geib, Flowserve's Labor Relations Manager North America, announced that Flowserve had decided to close its Williamsport facility and transfer all work to a recently purchased non-union location in Raleigh, North Carolina. Geib further stated that the Company would announce the closure to all employees assembled in the parking lot at 8:15 a.m. that same morning.



8.      At about 8:15 a.m. July 9, 2002, John Chappell, Williamsport General Manager, told the assembled employees that the plant would close and that operations would be phased out over the next year.

9.      Local 628 immediately moved to schedule a meeting to discuss Flowserve's planned closure of Williamsport.

10.     On July 18, 2002, Local 628 filed a written request for information on why Flowserve was closing Williamsport and what information the company had relied upon in making that decision.

11.     On August 1, 2002, the union committee met with Harvey Geib and Jeff Wingate representing the company.

12.     At the meeting, I specifically told Messrs. Geib and Wingate that Local 628 was opposed to Flowserve's decision to close the facility. The union committee reiterated its request that the company provide the union with the reasons for the closing and also requested that the company agree to bargain over their decision to relocate all work to North Carolina.

13.     At all times since August 1, 2002 up to the present date, Flowserve has refused to provide any information concerning the basis for its decision to close and has also refused to bargain over its decision with Local 628.

14.     At no time since July 9, 2002, have I or any other officer of Local 628 stated or otherwise indicated that Flowserve has the right to transfer all work or close its facility under the CBA.

15.     On September 24, 2002, I directed Local 628's attorneys to file a grievance with John J. Chappell, the General Manager of Flowserve in Williamsport, protesting Flowserve's transfer of all bargaining unit work out of the Williamsport facility. A copy of this "work relocation" grievance is attached as Exhibit "1."

16.     It is Local 628's position that Flowserve's relocation decision is a violation of the express provisions of the CBA.

17.   The relocation of all bargaining unit work and the shutdown of the facility without Local 628's agreement violates the CBA's recognition clause, wage and hours provisions, layoff procedures and management rights clause, among others.

18.   On or about October 2, 2002, Local 628 learned that Flowserve had invited a realtor to tour its Williamsport facility with the intent of listing the plant for sale.

19.   Chief Steward, David Schneider was able to obtain a copy of the listing for the union. A copy of the listing is attached as Exhibit "2."

20.   The listing indicates that the facility is available for possession in 60-90 days.

21.   On or about October 14, 2002, Local 628 became aware that work was being moved to Raleigh, North Carolina. John Chappell told David Schneider that effective the end of October all spare parts would be manufactured in Raleigh.

22.   Parts manufacture comprises a significant part of the Williamsport operation.

23.   On or about October 24, 2002, Local 628 filed a grievance over the transfer of parts manufacture.

24.   In discussions over the grievance, Flowserve indicated that the transfer of parts manufacture was connected to its decision to close Williamsport and claimed that it had a right to transfer the work under the CBA.

25.   At my direction, the transfer of parts manufacture grievance was submitted to arbitration on November 25, 2002.

26.   On November 15, 2002, Flowserve notified Local 628 that, as part of its work relocation, it would commence laying off bargaining unit members in December 2002. A copy of Flowserve's notice is attached as Exhibit "3."

27.   According to the schedule provided, Flowserve will terminate all bargaining unit members prior to May 31, 2003, the expiration date of the CBA.

28.   While it has refused to provide specific information, Flowserve has also indicated that it has begun, and will continue, to move raw materials, work, equipment and machinery out of Williamsport to Raleigh, North Carolina.

29.     On November 22, 2002, the American Arbitration Association notified Local 628 that Arbitrator Jeffrey Tener would hear Local 628's work relocation grievance on January 15, 2003. A copy the American Arbitration Association notice is attached as Exhibit "4."

30.     Local 628 has repeatedly requested that Flowserve maintain the status quo until the arbitrator renders his award.

31.     Flowserve has flatly refused all such requests.

32.     In all likelihood, Flowserve will have accomplished a complete shutdown of its facility, including terminating all employees and removing all equipment and machinery, prior to Arbitrator Tener having an opportunity to issue an award.

33.     Flowserve's ongoing relocation threatens severe and irreparable harm to Local 628 and its members in the following ways (among others):

a.      Flowserve will unilaterally terminate Local 628's representation rights prior to the expiration of the CBA. Under the CBA, Local 628 is forbidden to initiate any strike, slow down or work stoppage and is limited to submitting grievances. While Local 628's work relocation grievance proceeds to arbitration, Flowserve is steadily undermining Local 628's bargaining position by transferring work, removing equipment and machinery and terminating employees.

b.      All Local 628 represented employees will be terminated before the expiration of the CBA. The lives of these employees and their families will be gravely disrupted and they will not know whether they have been temporarily laid off or permanently terminated until the arbitrator issues a decision.

c.      Flowserve will liquidate all work that is the subject of the CBA. Work that Flowserve has agreed would be performed under specific wages and conditions and by specific employees will have been performed under inferior terms and conditions and by other employees.

d.      Flowserve will have removed all raw materials, work, equipment and machinery from its Williamsport facility. The more goods and machinery that its moved to

Raleigh, the more difficult and costly will be the return. With all materials, work, equipment and machinery removed, the arbitrator will be faced with ordering Flowserve to completely restore the Williamsport facility in order to fashion an adequate remedy.

34.     Thus, the grievance and arbitration procedure in the Local 628—Flowserve CBA cannot provide an adequate remedy for the injuries Flowserve is inflicting upon its employees. Under the existing procedure Flowserve could end Local 628's representation rights, terminate all employees, remove all raw materials and machinery and permanently close its facility prior to Arbitrator Tener having an opportunity to render an award. As a result the arbitrator would be left with no effective remedy for Flowserve's violation of our agreement.

The foregoing is true to best of my knowledge, information and belief.

KEITH A. LAIELLI

Sworn and Subscribed
Before Me This 3rd day
Of  November  , 2002

Notary Public

NOTARIAL SEAL
GENA L. STEIGER, Notary Public
Williamsport, Lycoming County
My Commission Expires Sept. 22, 2003

LAW OFFICES

# MERANZE AND KATZ

A PROFESSIONAL CORPORATION

BERNARD N. KATZ* ‡
MICHAEL N. KATZ*
ELISSA B. KATZ*
DAVID A. GAUDIOSO*
CLAIBORNE S. NEWLIN*

———————

OF COUNSEL
RONALD A. KOVLER*
BRAD S. RUSH*

* NEW JERSEY BAR ALSO
‡ NEW YORK BAR ALSO

TWELFTH FLOOR

LEWIS TOWER BUILDING

N.E. COR 15ᵀᴴ & LOCUST STREET

PHILADELPHIA, PA 19102-3977

215-546-4183

FAX: 215-790-1382



SENTRY OFFICE PLAZA
SUITE 703
216 HADDON AVENUE
WESTMONT, NJ 08108
856-662-3952

431 WYOMING AVENUE
SCRANTON, PA 18503
570-346-7699

M. HERBERT SYME
(1932-1956)
FRANK BIELITSKY
(1953-1970)
JOSEPH B. MERANZE
(1932-1995)

September 24, 2002

Mr. John J. Chappell
General Manager
Flowserve Corporation
701 First Street,
Williamsport, PA 17701

Re:    **Unilateral transfer of bargaining unit work**

Dear Mr. Chappell:

I am writing on behalf on IUE-CWA Local 628.

Local 628 protests Flowserve's determination to transfer all bargaining unit work out of the Williamsport facility. This decision unilaterally terminates our Collective Bargaining Agreement prior to its expiration and obliterates our bargaining unit. It will result in the loss of some seventy-five quality jobs and consequent hardship and misery for your dedicated employees and their families. That such a decision could be made in violation of your signed agreement, and without any meaningful attempt to meet your obligations to the Local and its members, is shocking.

Because of the nature of the underlying violation and its serious consequences, we propose that this grievance be immediately placed before an arbitrator in accordance with Step IV of ARTICLE XVI of the parties' agreement. Since the decision to close the Williamsport facility was made at the highest levels of the company, it seems pointless to process the grievance through the lower steps of the procedure.

The arbitrator should address 1) whether the employer's decision, and the process through which it was reached, is consistent with the Collective Bargaining Agreement, and 2) if not, what is the appropriate remedy. We will request that the arbitrator issue an order rescinding the employer's decision and prohibiting the transfer of work and the destruction of the unit.

John J. Chappell
Page 2 of 2
September 24, 2002

　　　　Please contact me quickly so that an arbitrator can resolve this dispute as soon as possible.

　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　MERANZE AND KATZ, P.C.

　　　　　　　　　　　　　　　BY:　　CLAIBORNE S. NEWLIN

cc:　　Cheryl D. McNeal, Corporate Vice President, Human Resourses
　　　　Harvey Geib, Manager of Labor Relations
　　　　Joseph Katula, International Representative
　　　　Keith Laielli, President
　　　　David Schneider, Chief Steward

Received Fax :        OCT 24 2002 10:25AM    Fax Station :   MERANZE & KATZ            p. 2



OCT 24 2002 10:27 FR W▆▆S FARGO HOME MTG 570 326 1233 TO 12▆▆901382        P.02/02
Expanded display                                                          Page 1 of 1

**Expanded display of ML# C36205**        Send Listing To...



| | |
|---|---|
| MLS#: C36205 | DOM: 6 |
| List Price: $2,095,000 | |
| Str#: 701 | |
| Dir: W | |
| Address: FIRST STREET | |
| Municipality: WILLIAMSPORT | |
| Type Bsn/Prop: Manufacturing | |
| Misc Srch: Indus Bldg Over 15000 SF | |
| Area: Williamsport, Woodward Twp | |

Listing Off: MERICLE COMMERCIAL RE SERVICES (33)
Office Phone: 570-323-1100
Listing Agt: DOUG KEIPER (2)
Agent Phone: 570-433-3028
Agent Email: mcreswp@epix.net

| | | | | |
|---|---|---|---|---|
| City | WILLIAMSPORT | State PA Zip Code 17701 | | Nghb/Sbdv WMSPT-WEST |
| Zoning | MH Age 1975 | Apx Grs Bld SF 164,556 SF | | |
| Taxes | $85,645 | Prcl # 65-7-327 | | DdBk/Pg 2733/32 |
| Fndt Sz | — | Bsmt PARTIAL | | Lot Size |
| Easements | — | Parking 94 VEHICLES | Elevator | YES |
| Rstrctns | — | Loading 4 DOORS | Offices | 15,360 |
| Floor | CARPET/VINYL | Apx Heat $ — | Water | PUBLIC |
| Sewer | PUBLIC | Electrcty — | Gas | YES |
| Load Dck | 4 DOORS | #Rstrms 6 Acres 6.65 | Schl | WILLIAMSPORT |
| Buyer Nm | | Selr Conc | | |
| Inclusns | | | | |
| Exclusns | | | | |
| Remarks | AN OFFICE/MFG FACILITY COMPOSED OF MAIN BUILDING IN EXCESS OF 132,000 SF WITH 4 OUTLYING STRUCTURES ON APPROX 6.65 ACRES. HIGH BAYS WITH INCREDIBLE | | | |
| Directions | CAPACITY, 18-32 FT CEILINGS & 4 LOADING DOORS. MAYNARD ST EXIT OFF I-180 TO 1ST STREET. | | | |
| Ownr/Phn | FLOWSERVE CORP. | | | |
| Occ/Phn | | | | |
| Warrnty | NO Sub Agt Y $/% 3% | Byr Agt Y $/% 3% | | |
| Trans Lic | $/% Pending Dt | | | |

**Type of Bus/Prop:** Manufacturing
**Number Stories:** Two Story w/Basement
**Construction:** Block, Steel Metal Frame
**Heating System:** Steam
**Air Conditioning:** Central Electric
**Utilities:** Electricity, Gas, Public Water, Sewer
**Roof System:** Built-up
**Flooring:** Carpet & Vinyl
**Access:** City Road, Interstate Less than 1 mile
**Location:** Inside Lot
**Sale Includes:** Building & Land
**Terms of Existing Lease:**
**Misc Search:** Elevator, Security System, Sprinkler

**Misc Search:** Indus Bldg Over 15000 SF
**Financing:**
**Possession:** 60-90 Days
**Showing Instructions:** Call LA Appointment
**Area:** Williamsport, Woodward Twp

Information Herein Deemed Reliable but Not Guaranteed

Received Fax : NOV 20 2002 11:33AM Fax Station : MERANZE & KATZ p. 1

11/20/2002 WED 11:31 FAX ● ● ☑001/002



Harvey Geib
Labor Relations Manager
North America

November 15, 2002

Mr. Keith Laielli
Union President
International Union of Electronic, Electrical, Salaried,
Machine & Furniture Workers, Local Union No 628
Williamsport, PA 17701

David Schneider
Chief Steward at Flowserve Corporation – Williamsport
International Union of Electronic, Electrical, Salaried,
Machine & Furniture Workers, Local Union No 628
Williamsport, PA 17701


Gentlemen:

This letter will serve as official WARN notice update on the personnel being laid
off due to the closure of the facility located at 701 First Street, Williamsport,
Pennsylvania. As my previous correspondence indicated layoffs would take place
on several dates commencing in October of 2002 and expecting to be completed
by May 2003. Due to the recent attritions at Williamsport, the layoffs will
commence in December of 2002 with the completion date of May 2003 still
anticipated.

The job positions and the names of current jobs, which will be affected by this
permanent layoff, are as follows: It is still impossible to determine the exact
timing of when employees will be laid off.

Flowserve Corporation          733 Kraft Road          Phone 863-648-5552 Ext. 208
Flow Solutions Division        Lakeland, Florida 33815  Facsimile 863-648-0352 Secure
                                                        hgeib@flowserve.com

Received Fax :        NOV 20 2002 11:33AM     Fax Station :   MERANZE & KATZ              p . 2

11/20/2002 WED 11:32  FAX                                                    ☒ 002/002

The transition of work is a long process that is expected to take several months.
The following is our best estimate of the time frame in which employees will be
separated from the organization.  This is our best estimate of when the actual
separation date is anticipated for each classification:

| | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | April | May |
|---|---|---|---|---|---|---|---|---|
| | | 15 | 10th-20th | 10th-20th | 10th-20th | 10th-20th | 10th-20th | 10th-20th |
| Direct Labor | | 0 | 8 machinists<br>1 welder | 6 machinists<br>4 assemblers | 3 machinists<br>1 welder<br>4 assemblers | 2 machinists<br>1 assembler | 2 machinists<br>1 assembler | 1 machinist<br>3 assemblers<br>1 welder |
| Total Direct | 0 | 0 | 9 | 10 | 8 | 3 | 3 | 5 |
| Indirect Labor | | | 1 janitor<br>1 inspector<br>1 maintenance | 1 shipper<br>1 inspector<br>1 stores<br>1 machinist | 1 machinist<br>1 inspector<br>1 storeman<br>1 shipper | 1 inspector<br>1 maintenance<br>1 machinist<br>1 storeman<br>1 shipper | 1 machinist<br>1 maintenance | 1 storeman<br>1 inspector<br>2 shippers<br>1 maintenance |
| Total Indirect | 0 | 0 | 3 | 4 | 4 | 5 | 2 | 5 |
| Monthly Total | 0 | 0 | 12 | 14 | 12 | 8 | 5 | 10 |

Should you have any questions please feel free to contact me.

Regards,

*Harvey K. Geib*

Harvey K. Geib
Labor Relations Manager
North America

CC: Joe Katula, International Representative

# AMERICAN ARBITRATION ASSOCIATION
## Notice of Hearing

November 22, 2002

Claiborne Newlin, Esq.
Meranze and Katz
1200 Lewis Tower Building
15th & Locust Streets
Philadelphia, PA  19102

Robert B. Cottington, Esq.
Reed Smith Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA  15219-1886

Re: 55 300 00365 02
    IUE-CWA LOCAL 628
    and
    FLOWSERVE CORPORATION


Grievances:    Work Relocation Grievance


PLEASE TAKE NOTICE that a hearing in the above-entitled arbitration will be held as follows:

Place:
  Genetti Hotel & Convention Center
  200 West 4th Street
  Williamsport, PA 17701

Date:   January 15, 2003
Time:   10:00 AM
Before: Jeffrey Tener


NOTE:

Please attend promptly with your witnesses and be prepared to present your proofs.

Christine Naida
Case Manager
215 731 2274
naidac@adr.org

NOTICE:  The arbitrator(s) have arranged their schedule and reserved the above date(s) based on the advice of the parties. Therefore, every effort should be made to appear on the date(s) scheduled.  In the event that unforeseen circumstances make it impossible to attend the hearing as scheduled, a party requesting a postponement should obtain the agreement of the other party.  If there is no mutual agreement, the arbitrator(s) will make a determination.  All requests for postponements must be communicated to the Case Manager not the arbitrator).  There should be no communication between the parties and the neutral arbitrator(s) other than at oral hearings.  In some instances, postponements are subject to cancellation fees by the arbitrator(s).  Any party wishing a stenographic record must make arrangements directly with the stenographer and notify the other parties in advance of the hearings.

cc:    Mr. Jeffrey Tener; Mr. Harvey Geib





## Announcement to Williamsport Facility Employees Regarding Closure

July 9, 2002

Flowserve Employees:

As you are aware, Flowserve recently finalized the acquisition of the Invensys Flow Control division, a major manufacturer of valves in our industry. The joining of Flowserve and IFC fully supports our stated strategy for growth. It is a prudent acquisition, one that enhances our range of products and broadens our base of customers in the flow control industry.

As a result of the acquisition and to best utilize Flowserve's capacity, we are closing the Williamsport operations.  The manufacture of products currently produced in Williamsport will be transitioned to Flowserve's manufacturing facilities in Raleigh, NC between now and Mid 2003.

Even though some people may be asked to relocate with the business, many employees will be terminated. As we work through the transition, most employees will be offered the opportunity to stay on board until late 2002 or early 2003 depending on their job function and how it relates to the closure schedule.

Salaried employees who are laid off and who stay on board with the company until their designated date will be eligible to receive a severance package consistent with company policy. For bargaining unit employees, contract provisions will apply. Additionally, we are committed to providing career transition assistance to all those affected and will look for opportunities for qualified employees who are willing to relocate to other Flowserve facilities.

While we recognize the closure of this facility will be challenging, our intention is to ensure a smooth transition of the operation to the new location, with minimal disruption to our customers. We will communicate with key customers to let them know of the changes and to assure them that they will continue to receive the same quality products and services in a timely manner from Flowserve.

# CERTIFICATE OF SERVICE

I, Claiborne S. Newlin, state that on December 4, 2002, I sent a copy of the Plaintiff's Complaint, Motion For Temporary Restraining Order and Preliminary Injunction and Memorandum Of Law via Overnight Mail – postage prepaid to the following:

Robert B. Cottington, Esq.
Reed Smith Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA 15219-1886


Jeff Wingate
Flowserve Corporation of Pennsylvania
701 First Street
Williamsport, PA 17701

CLAIBORNE S. NEWLIN, ESQUIRE