MERANZE AND KATZ, P.C.
BY:   Bernard N. Katz, Esquire (Id. # 09723)
      Claiborne S. Newlin, Esquire (Id. # 84371)
225 S. 15th Street, 12th Floor
Philadelphia, PA 19102
Tel.: (215) 546-4183
Fax: (215) 790-1382

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IUE-CWA, LOCAL 628<br>429 West Third Street<br>Williamsport, PA 17701<br>　　　　　　　　　Plaintiff,<br>　　　v.<br>FLOWSERVE CORPORATION<br>701 First Street<br>Williamsport, PA 17701<br>　　　　　　　　　Defendant | CIVIL ACTION<br><br>4: CV02 2225 |

**MEMORANDUM OF LAW IN SUPPORT OF
IUE-CWA, LOCAL 628'S MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff, IUE-CWA, Local 628 (Local 628) submits this memorandum of law in support of its motion of a Temporary Restraining Order and Preliminary Injunction.

**BACKGROUND**

Local 628 represents the employees of Flowserve Corporation (Flowserve) at Williamsport PA. Local 628 and Flowserve Corporation are parties to a Collective Bargaining Agreement (CBA) covering the terms and conditions of employment for all production and maintenance employees at the Williamsport facility. The Agreement is effective for the period June 3, 2000 through May 31, 2003. (A copy of the CBA is attached to the complaint as Exhibit "A.")

1

As part of this Agreement, Local 628 and Flowserve Corporation manifested a clear intent to preserve and protect the work of the bargaining unit. In the Witness statement, the parties stated that they were entering into agreement:

> ... in order to provide a continued working arrangement between the Company and the Union, and promote an improved industrial and economic relationship between them ....

The parties agreed that Local 628 would be the sole and exclusive bargaining agent for production and maintenance employees for the duration of the Agreement, that employees would work a forty hour work week, that supervisors would not perform bargaining unit work except as part of training or instructing employees, that employees would be paid a set wage rate and that layoffs would only occur for lack of work. Management did reserve the right to direct the work force, to plan, direct and control plant operations and to introduce new or improved production methods among others. But the right to close the plant and/or relocate all bargaining unit work was not reserved.

On July 9, 2002, Flowserve Corporation announced that it had decided to close its Williamsport facility and transfer all work to Raleigh, North Carolina. Flowserve made no attempt to consult with, or even inform, Local 628 about its decision. Flowserve refused to provide any reasons for its decision or to share any of the underlying information on which its decision was based. To all questions, Flowserve merely replied that it had decided all work would be relocated and all employees would be terminated.

Despite repeated requests, Flowserve has flatly refused to discuss its decision to close. Flowserve stated that it would not bargain over the decision to close but would agree to bargain over the effects of the closure. Specifically, Flowserve was only willing to discuss the procedure for terminating employees and a possible severance package. The company stated, however, that it would not reevaluate its decision to close nor would it entertain any changes in the CBA that Local 628 might propose in order to induce Flowserve to change its mind.

Local 628 has vigorously opposed Flowserve's decision. The union has argued that Flowserve's relocation decision violates the CBA. In August 2002, Local 628 met with Flowserve in an effort to induce the company to discuss, and hopefully, reconsider the closure. During these meetings, Local 628 made clear that Flowserve was violating the CBA both by unilaterally transferring all bargaining unit work to North Carolina and also by refusing to bargain with the union about its decision. The union stated that the CBA does not give Flowserve the right to transfer all bargaining unit or to close its facility. The union also stated that the Flowserve had an obligation to negotiate with Local 628 over its decision both under the Agreement and under the National Labor Relations Act as well.

Once it became clear that no amount of discussion would induce Flowserve to rethink its position, Local 628 decided to exercise its right to arbitration under the CBA. On September 24, 2002, Local 628 filed a grievance over Flowserve's decision and requested that the grievance proceed immediately to arbitration. Flowserve initially responded by denying that the grievance was not arbitrable but later relented. On October 10, 2002, Flowserve indicated that it would participate in the selection of an arbitrator to hear the work relocation grievance. On November 25, 2002, the American Arbitration Association notified the parties that Arbitrator Jeffrey Tener had been selected by them to hear the case on January 15, 2002.

Despite agreeing to arbitrate the dispute, Flowserve has refused all requests to maintain the status quo pending the arbitrator's decision and is, in fact, accelerating its plan to liquidate the facility. On October 4, 2002, the union learned that Flowserve had invited a realtor to tour the facility and later obtained a copy of the listing of the facility. Significantly the listing stated that the possession of the plant was available within 60-90 days. On October 14, 2002, the union discovered that the company planned to transfer all spare parts manufacture to North Carolina. Since spare parts manufacture is a significant part of the Williamsport operation, Local 628 filed a grievance over the issue. During discussions over the grievance Flowserve informed the union

that the parts transfer was part and parcel of its relocation of work to Raleigh, North Carolina and would proceed over any union objection. On November 25, 2002, Flowserve notified Local 628 that, as part of its closure, layoffs would begin in December and would progress over the next few months so that all bargaining unit members would be terminated before the expiration of the CBA. Though it has refused to provide specific details, Flowserve has told Local 628 that it will proceed to relocate more raw materials, work, equipment and machinery over the next few months. (*See*, Compl., Exhibit "B," Laielli Aff. at ¶¶18-24.)

As a result, Local 628 faces the real possibility that Flowserve's Williamsport facility will be entirely liquidated by the time Arbitrator Tener has an opportunity to render a decision. As a result, even if he decides in the union's favor, Tener will be unable to restore the status quo prior to Flowserve's decision to liquidate its facility. Flowserve will have stripped its Williamsport plant of all raw materials, equipment and machinery and it may well have sold the plant to another company. Flowserve will have terminated all its employees, causing untold harm to these employees and their families. Finally, by liquidating the facility and terminating its employees, Flowserve will have effectively destroyed Local 628's bargaining power.

**ARGUMENT**

Where an employer breaches its obligations under a collective bargaining agreement, a union may seek injunctive relief under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, in order to preserve the status quo prior to arbitration of the dispute. *See, e.g., Gateway Coal v. United Mine Workers*, 414 U.S. 368 (1974) (endorsing District Court's decision to suspend two mine foreman charged with safety violations pending arbitration of safety disputes); *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 727 F.2d 1094 (3rd Cir. 1985) (upholding an injunction enjoining an employer from distributing funds derived from the sale of its business pending arbitration). To obtain an injunction in such circumstances, the union must demonstrate that an injunction is necessary to prevent conduct that threatens or

frustrates the arbitral process agreed to by the parties. *Sky Vue Terrace*, 727 F.2d at 1098. The union must also show both that the underlying dispute is arbitrable and that the traditional requirements for injunctive relief favor an award. *Id.*

In the instant case, Local 628 can meet these requirements. Local 628 can demonstrate that its relocation dispute with Flowserve is subject to the arbitration provision of the CBA, that Flowserve is taking actions that frustrate the arbitration process and that the ordinary principles of equity favor an injunction under the circumstances. We will address each requirement in turn.

The Third Circuit has stated a three-part test for determining whether an injunction should issue in a labor dispute. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Textron Lycoming Reciprocating Engine Division*, 919 F.Supp. 783, 788 (M.D. Pa. 1996); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Exide Corp.*, 688 F.Supp. 174, 186-7, (E.D. Pa 1988). To determine if an injunction is appropriate, the court must examine 1) whether the underlying dispute is subject to mandatory arbitration, 2) whether the employer's actions are interfering with and frustrating the arbitral process, and 3) whether the ordinary principles of equity favor an injunction. *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1278-89 (3rd Cir. 1979);

A.   **The Underlying Dispute Is Subject To Arbitration**

Whether a party has agreed to arbitrate disputes and whether a dispute is arbitrable is a question of law for the court. *Morristown Daily Record v. Graphic Communications Union Local 8N*, 832 F.2d 31, 33 (3rd Cir. 1987). The Supreme Court has declared that a court's role in compelling arbitration of a dispute should be limited to determining whether the party seeking arbitration is making a claim that on its face is governed by the contract. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567-68 (1960). In keeping with the strong federal policy favoring arbitration of labor disputes, courts will presume that a dispute is

arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) Courts will only decided that a dispute is not arbitrable when the underlying agreement explicitly exempts the conduct at issue or when the terms of the agreement read as a whole clearly exclude arbitrability. *Controlled Sanitation Corp. v. District 128*, 524 F.2d 1324, 1328 (3rd Cir. 1975), *cert. denied*, 424 U.S. 915 (1976).

The Local 628—Flowserve CBA has a broadly worded grievance and arbitration clause. A grievance is defined as a "difference ... between the Company and the Union concerning the effect, meaning, application, compliance, claim of breach of violation of the Agreement, or any other dispute ... between the parties ...." (See, Plt.'s Compl, Exhibit "A," Article XVI.) Step IV of that procedure states:

> Should the Company and Union fail to settle any dispute or grievance after completing the above procedure, the matter may be submitted to arbitration .... Only grievances involving the interpretation or application of express provisions of this Agreement shall be subject to Arbitration. (Article XVI, Section 1.)

In other words, the parties have agreed that any dispute that relates to an express provision of the agreement may be submitted to arbitration.

Local 628's grievance objecting to Flowserve's relocation of all bargaining unit work is arbitrable. In the dispute, both Local 628 and Flowserve make reference to express provisions of the agreement. Local 628 argues that Flowserve's decision to relocate bargaining unit work violates numerous clauses of the Agreement, including the recognition clause (Article II), the management rights clause (Article III), the wage clause (Article V), the hours and overtime clause, seniority clause and others. Flowserve, however, contends that it has the right to relocate bargaining unit work under the management rights provisions. Moreover, although it initially argued that the grievance was not arbitrable, Flowserve has now changed its position. Flowserve

6

actively participated in the selection of an arbitrator and the scheduling of a hearing. As a result, there is really no dispute between the parties over the arbitrability of the relocation grievance.

### B. Flowserve Is Taking Steps To Frustrate The Arbitral Process

Flowserve's conduct frustrates the arbitral process. Flowserve is laying off employees and transferring work and equipment in a manner that is designed to liquidate the facility prior to any arbitrator having an opportunity to issue an award. Flowserve has provide the union with a plan for layoffs under which all Local 628 members will be discharged before the termination of the CBA on May 31, 2002. Flowserve has already transferred all spare parts manufacture to Raleigh. This parts manufacture made up a significant portion of Flowserve's work. While declining to provide details, the Company has indicated that it will continue to move equipment and machinery out of Williamsport over the next period. Finally, Flowserve has listed its facility for sale.

In the absence of an injunction maintaining the status quo, arbitration will be totally ineffective. Flowserve's actions totally undercut an arbitrator's ability to render an effective award. By liquidating its facility, Flowserve Corporation would present the arbitrator with a situation in which he would be without any power to award any but the most superficial remedy. Under normal circumstances, if he were to find in favor of Local 628, the arbitrator would direct Flowserve to abandon its relocation plans and to continue its employment of Local 628 members for the rest of the contract term. However, once the plant is dismantled, it is not feasible for the arbitrator to order the reopening and the reconstitution of the plant's operations.

A failure to enjoin this conduct will also put Local 628 in an untenable situation. Local 628 has given up the right to engage in a slowdown, work stoppage or strike in exchange for an effective arbitration procedure. In normal circumstances, the union need not worry about abandoning its economic weapons because, if he finds in the union's favor, the arbitrator can restore the conditions that existed prior to the contract violation. In the present circumstances,

however, a Local 628 victory is likely to be a "hollow formality" because the arbitrator could not return the parties substantially to the status quo ante. *Fort Pitt*, 598 F.2d at 1282.

### C. The Principles of Equity Favor An Injunction

On equity grounds, the Third Circuit has stated that courts must weigh four factors: 1) whether the movant has demonstrated a reasonable probability of success on the merits; 2) whether the movant will be irreparably harmed by failure to grant an injunction; 3) whether granting relief will result in even greater harm to the nonmoving party; and 4) whether granting an injunction will be in the public interest. *Gerardi V. Pelullo*, 16 F.3d 1363 (3rd Cir. 1994). The four factors all balance in the favor of Local 628.

#### 1. Local 628 Can Demonstrate Probability Of Success on the Merits

Because of the federal policy in favor of arbitration, a union need only cross a low threshold, to demonstrate probability of success on the merits. The union need only show that the position it takes is sufficiently sound to prevent arbitration from being a futile endeavor. *Sky Vue Terrace*, 759 F.2d at 1098 n.3.; *accord, Machinists Local 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981)(To show likelihood of success on the merits, a union must merely demonstrate a colorable claim to prevent the arbitration from being a futile endeavor). To hold the union to higher standard of proof would intrude on the arbitrator's function and result in the kind of judicial preemption of the arbitral process condemned by the Supreme Court. *Id.*

Local 628 can show that its position is sufficiently sound to prevent arbitration from being a futile endeavor. The CBA runs through May 31, 2003. For the term of the Agreement, Flowserve agreed to recognize Local 628 as the bargaining agent for its production and maintenance employees. Flowserve also agreed that those employees would work under defined conditions at set rates of pay. Flowserve promised that employees would work a 40-hour week and would only be laid off for lack of work. Flowserve negotiated for the right to run its business, the right to plan, direct and control all plant operations and the right to establish,

change, or introduce new or improved production methods, standards, or facilities. But nowhere does the Agreement either explicitly, or by implication, give Flowserve the right to relocate <u>all</u> bargain unit work, to terminate all employees and to permanently close its facility. In fact, given the express language CBA, Local 628 has a good chance of prevailing at arbitration.

2. **Local 628 Will Be Irreparably Harmed By Failure To Grant An Injunction**

To demonstrate irreparable harm, the petitioner must show that the harm threatened by the defendant's conduct cannot be compensated by money damages. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102-03 (3rd Cir. 1988). Moreover, the prospective harm must be immanent. The petitioner must demonstrate that it is in danger of suffering irreparable harm at the time the injunction is to be issued. *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244 (3rd Cir. 1985). In the context of an injunction in aid of arbitration, the petitioner must prove that, in the absence of an injunction, an arbitral award in its favor will nothing more than a "hollow formality." *Fort Pitt*, 598 F.2d at 1282.

Local 628 and its members face immanent irreparable harm. Flowserve has refused to maintain the status quo pending arbitration. It has announced that it is closing the Williamsport facility and that its decision is irrevocable. It has produced a schedule for terminating all of its employees before the expiration of the CBA and plans to commence those terminations in December of 2002. A major portion of the facility's work has already been moved to Raleigh and while Flowserve refuses to provide details, plans have been made to move out much of the machinery and equipment. Flowserve has also placed its facility on the market for sale.

By the time the arbitrator has an opportunity to issue an award, Flowserve Williamsport is likely to be gone. The raw materials, work, equipment and machinery will have been removed. All employees will have been terminated. Even the land and the building will likely have been sold. In such a situation, a Local 628 victory will indeed be a hollow one. The arbitrator will be hard pressed to order Flowserve to reopen its facility, to reinstall the removed equipment and to

recall employees. It is also doubtful that the arbitrator has the legal power to reverse the sale of the building.

Numerous courts have found irreparable harm when faced with a plant closing. In *Lever Brothers Company v. International Chemical Workers Union*, the Court reviewed the grant of an injunction preventing an employer from relocating its soap operation from Baltimore, MD to Hammond, IN. 554 F.2d 115, (4th Cir. 1976). The Court noted that, absent an injunction, "the employees would be totally and permanently deprived of their employment" and the union would face the "double burden of convincing the company not only not to move ... but to return the plant." *Id.* at 122. Similarly in *International Ladies' Garment Workers' Union v. Bali Co.*, the Court found that the employer decision to close its operation constituted irreparable harm. 649 F.Supp. 1083, 1087 (D. P.R. 1986) The Court stated:

> Closure of the plant prior to arbitration would present the arbitrator with a fact accompli, leaving him without any real power to award an adequate remedy. Continued employment for the present employees would be the appropriate remedy in this case if the arbitrator finds in favor of the union. However, once the plant is dismantled it is unfeasible for the arbitrator to order reconstruction and reopening of operations. *Id.*

In the one case where irreparable harm was not found in a plant closing, the Court based its decision on the fact that the employer's decision was reversible. The Court noted that the employer's statement that the decision to close was "irrevocable" was "merely a meaningless posturing position" used by the employer in tough bargaining over desired changes in work rules. *Local 715 v. Michelin American Small Tire*, 840 F.Supp. 598, 604 (N.D. Ind. 1993). The Court also noted that the employer's planned minimal removal of machinery might not result in layoffs given the underutilization of its equipment. *Id.* Although refusing an injunction, the Court did state that a "truly irreversible, permanent loss of jobs does satisfy the requirement of irreparable harm." *Id. See also, Teamsters Local 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir. 1978), *cert. denied*, 440 U.S. 929 (1979) (employer enjoined from partial liquidation of

## CONCLUSION

For all the reasons set forth above, plaintiff IUE-CWA, Local 628 urges this Honorable Court to grant its request for a Temporary Restraining Order and Preliminary Injunction to restore the status quo pending resolution of the grievance or arbitration.

Respectfully submitted,

MERANZE AND KATZ, P.C.

BY: BERNARD N. KATZ
CLAIBORNE S. NEWLIN

December 5, 2002

business); *Aeronautical Indus. Dist. Lodge 91 v. United Technologies Corp.*, 87 F.Supp.2d 116, (D. Conn. 2000) (employer enjoined from removing parts repair work to another facility).

### 3. Grant of Relief Will Not Produce Greater Harm To Flowserve

The balance of equities favors an injunction. Faced with an injunction, Flowserve will merely have to postpone its liquidation of the Williamsport facility. It will have to delay the planned layoffs, cancel the removal of machinery and equipment and remove the listing of the plant for sale. If the arbitrator rules in Flowserve's favor, it will suffer, at most, a several month hiatus in its relocation plans. Where Local 628 faces the irrevocable loss of its bargaining rights and the termination of all employees if an injunction does not issue, Flowserve will merely have to tolerate a several month delay.

### 4. Granting Injunction Is In The Public Interest.

Under the circumstances, an injunction is in the public interest. Flowserve's actions run directly counter to what the Supreme Court has identified as a fundamental labor policy—encouraging and promoting the voluntary resolution of labor disputes through arbitration. *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). Flowserve and Local 628 negotiated a CBA in order to set out their mutual obligations and responsibilities and to provide a mechanism to resolve their disputes short of economic warfare. While agreeing to arbitration, however, Flowserve simultaneously maneuvers to remove the very subject of the arbitration—bargaining unit work—from the arbitrator's reach. Flowserve is attempting to ensure that, regardless of how the arbitrator eventually rules, its plan to close the Williamsport facility succeeds. It should not be permitted to undermine the arbitrator's ability to fashion a remedy and, by extension, to subvert the arbitration process itself. Enforcement of the federal policy favoring voluntary resolution of labor disputes demands that Flowserve's conduct be enjoined.